**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES PEPPER AND LISA PEPPER, individually and as parents and natural guardians of J.P., a minor,<br><br>Plaintiffs,<br><br>*v.*<br><br>THE CENTRAL BUCKS SCHOOL DISTRICT,<br><br>STEVEN YANNI, in his individual and official capacities,<br><br>NADINE GARVIN, in her individual capacity,<br><br>ALYSSA WRIGHT, in her individual capacity,<br><br>DAVID HEINEMAN, in his individual capacity,<br><br>ROBERT FREILING, in his individual capacity,<br><br>KATHLEEN VEISZ, in her individual capacity,<br><br>CHRISTINE TRAWINSKI, in her individual capacity,<br><br>GABRIELLE MCDANIEL, in her individual capacity,<br><br>RACHEL AUSSPRUNG, in her individual capacity,<br><br>CARA ALDERFER, in her individual capacity, | **CIVIL ACTION NO. 2:26-CV-7488**<br><br>**JURY TRIAL DEMANDED** |

| | |
|---|---|
| and<br><br>KATHY MOELTER, in her individual capacity,<br><br>Defendants. | |

## COMPLAINT – CIVIL ACTION

"The first truth today is that the children in Classroom 119 at Jamison Elementary School were abused by their teacher [Defendant Gabrielle McDaniel] and their educational assistant [Defendant Rachel Aussprung]. . . . As the solicitor of this School District, I am telling you those students were abused by their teacher and their educational assistant."

Peter C. Amuso, Solicitor, Central Bucks School District, August 19, 2025

## I. INTRODUCTION

1. This is a civil rights action brought pursuant to 42 USC §1983, the 14th amendment to the United States Constitution, and supplemental state law claims, arising from the severe and pervasive abuse of Plaintiff J.P., a ten-year-old boy with nonverbal autism at Jamison Elementary School in the Central Bucks School District ("CBSD").

2. The Central Bucks School District has already admitted to these abuses and the "horrors" that J.P. and other students were forced to endure in Room 119 of Jamison Elementary School.

3. The abuse included – but is not limited to – nearly 3,000 illegal restraints of J.P. over a three-month period, water restriction, corporal punishment, forced exposure to nudity and sexual self-stimulation, screaming, mocking, belittling, and concealment of a head injury in a series of events that were intended to, and indeed did, dehumanize J.P. because he was different. These horrific abuses were not, however, schoolyard acts of bullying but a calculated pattern of debasement by a teacher and educational assistant, individuals entrusted with the care of J.P. and

the subsequent endorsement of these "horrors" by a series of administrators who knew better, but chose rather to do their best to "to keep [CBSD] out of the newspaper."

4. Defendants, including staff, employees, and agents of CBSD, engaged in a concerted cover-up of this abuse that included:

a. Establishing a policy illegally requiring mandated reporters, including teachers and staff, to obtain approval from school administrators prior to filing a ChildLine report concerning allegations of child abuse;
b. Illegally failing to immediately file a ChildLine report once the allegations of child abuse were received;
c. Illegally filing a ChildLine report that failed to truthfully disclose the full extent of the allegations of child abuse received;
d. Continuing to allow students, including J.P., to be exposed to abusive staff members even after allegations of child abuse were received;
e. Concealing the truth of the allegations of child abuse from parents, law enforcement, ChildLine authorities, Children and Youth authorities, and the community at large;
f. Falsely claiming that the removal of a whistleblower from Classroom 119 was the result of a "personality conflict" between the whistleblower and the perpetrator staff members;
g. Falsely reporting to parents, law enforcement, and the community at large that CBSD's own internal investigation "found no evidence of abuse;" and
h. Spoliating critical evidence by choosing concealment instead of preservation, including video recorded evidence of the abuse central to this case;

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983. Supplemental jurisdiction exists over state law claims pursuant to 28 U.S.C. §1367.

6. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391, because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought and Defendants reside or operate therein.

## III. PARTIES

7. Plaintiff J.P. is a ten-year old boy with nonverbal autism. J.P.'s date of birth is February 13, 2016. J.P. is currently in fourth grade.

8. Plaintiff James Pepper is an adult resident of Bucks County, Pennsylvania and the father of J.P.

9. Plaintiff Lisa Pepper is an adult resident of Bucks County, Pennsylvania and the mother of J.P.

10. Plaintiffs James Pepper and Lisa Pepper are referred to collectively as "Parents."

11. Defendant Central Bucks School District ("CBSD") is a public school district in Bucks County Pennsylvania, receiving federal funds and is located at 20 Welden Drive, Doylestown, PA 18902.

12. Defendant Steven Yanni ("Yanni") is the former Superintendent of the Central Bucks School District and resides at 5051 Rosewood Drive, Doylestown, PA 18902.

13. Defendant Nadine Garvin ("Garvin") is the former Assistant Superintendent for elementary schools for the Central Bucks School District and resides at 10 Penn Manor Court, Fort Washington, PA 19034.

14. Defendant Alyssa Wright ("Wright") is the former Director of Pupil Services for the Central Bucks School District and resides at 4441 Honeysuckle Lane, Doylestown, PA 18902.

15. Defendant David Heineman ("Heineman") is the former principal at Jamison Elementary in the Central Bucks School District and resides at 1971 Maplewood Avenue, Abington, PA 19001.

16. Defendant Robert Freiling ("Freiling") is the former Director of Human Resources for the Central Bucks School District and resides at 7335 Tabvor Avenue, Philadelphia, PA 19111.

17. Defendant Kathleen Veisz ("Veisz") is a former Supervisor of Special Education for the Central Bucks School District and resides at 4168 Miladies Lane, Doylestown, PA 18902.

18. Defendant Christine Trawinski ("Trawinski") is a former Human Resources Manager for the Central Bucks School District and resides at 119 Pipers Inn Drive, Fountainville, PA 18923.

19. Defendant Gabrielle McDaniel ("McDaniel") is a former teacher at Jamison Elementary in the Central Bucks School District and resides at 129 Glendale Road, Havertown, PA 19083.

20. Defendant Rachel Aussprung ("Aussprung") is a former educational assistant at Jamison Elementary in the Central Bucks School District and resides at 468 Prospect Road, Warminster, PA 18974.

21. Defendant Cara Alderfer ("Alderfer") is the president of the Central Bucks Education Association and a teacher in the Central Bucks School District. She resides at 1206 Rt. 152, Perkasie, PA 18944.

22. Defendant Kathy Moelter ("Moelter"), a teacher in the Central Bucks School District and served as Jamison Elementary's union representative during the period described in this Complaint. She resides at 3 Cedar Crest Court, Doylestown, PA 18901.

## IV. FACTUAL ALLEGATIONS

i. *Plaintiffs J.P., James Pepper, and Lisa Pepper*

23. J.P. is a ten-year-old boy with nonverbal autism enrolled in the Central Bucks School District.

24. From September 2023 through December 2024, J.P. was a student at Jamison Elementary assigned to Classroom 119.

25. J.P. was also taught by Defendant Gabrielle McDaniel during the 2024 extended school year at Mill Creek Elementary School.

26. J.P. is, and at all times relevant was, an otherwise qualified individual with a disability, identified as entitled to special education under the Individuals with Disabilities Act (IDEA) and entitled to a Free Appropriate Education and full participation in the public program of Education under Section 504.

27. J.P. is diagnosed with autism, a disability characterized by deficits in social interaction, verbal and nonverbal communication, behavioral and sensory dysfunction, self/inward directed focus, and restricted interests.

28. J.P. is nonverbal and is learning to communicate through an assisted technology device, referred to as "a talker." The talker serves as his voice, allowing him to make simple requests and express distress.

29. As a consequence of being nonverbal, and at least in part the conduct of those responsible for him at CBSD, J.P. was incapable of informing anyone of any of the abuse he was suffering while he was a student in the CBSD.

30. J.P. requires extensive specialized adult support and accommodation within his classroom, including a full time, one-to-one classroom behavioral assistant. The assistant is an employee of CBSD.

31. Special education for young children with autism focuses on increasing socially appropriate behavior, teaching and facilitating communication, developing teacher/learner relationships, decreasing inwardly directed withdrawal while increasing outside engagement, as well as development of basic academic skills.

32. Self-directed sensory stimulation and sensory defensiveness are common behavioral symptoms of autism and identified as barriers to be reduced via special education behavioral programming. Both symptoms can manifest through clothing removal in small children.

33. Appropriate behavioral programming focuses on drawing students out, decreasing inward behavior while encouraging socially appropriate behavior, encouraging students to engage with the outside world and developing skills necessary to access the community.

34. J.P. has an Individualized Education Program (IEP) that includes goals, *inter alia*, in behavior, academics, and communication. J.P.'s IEP was drafted in May, 2024. J.P.'s IEP was regularly updated and represented, to Parents, that J.P. was successfully participating in the classroom and making progress.

35. Parents relied upon CBSD's representations regarding J.P's program and progress. They did not become aware of the acts of discrimination, abuse, and retaliation that form the basis of this Complaint until advised, by a whistleblower classroom aide, on or about December 21, 2024.

36. Parents have another son, J.P. 2, who is J.P.'s older brother.

37. J.P. 2 has also been diagnosed with nonverbal autism. J.P. 2 attends a specialized private autism school at CBSD's expense, following Parents' exercise of their procedural rights under the IDEA via a Due Process Hearing.

38. As described *infra*, CBSD, its employees and agents retaliated against James Pepper and Lisa Pepper for their advocacy of J.P. 2.

39. James Pepper served as an elected member of the Central Bucks School Board for approximately four years. During that service, he was a frequent and outspoken advocate for

students with disabilities and special-education students, including students with significant support needs.

40. James Pepper also spoke publicly and in his capacity as an elected official concerning matters of public concern affecting CBSD, including antisemitism and the District's response to antisemitic incidents and concerns.

41. Parents previously invoked the IDEA's due-process procedures on behalf of J.P.'s older brother, J.P. 2, and obtained a specialized private-school placement at CBSD expense. The exercise of those rights was known within CBSD. Indeed, when Alyssa Kline began working in Room 119, Defendants McDaniel and Aussprung warned Kline about Parents and specifically told her that Parents had "sued the School District" before.

42. James Pepper also exercised his rights under the Free Speech and Petition Clauses of the First Amendment by filing an educator-misconduct complaint with the Pennsylvania Department of Education and, after being threatened with criminal enforcement of the Educator Discipline Act's confidentiality provisions, bringing a federal civil-rights action against the Bucks County District Attorney and the Attorney General of Pennsylvania. *See Doe v. Schorn*, 711 F. Supp. 3d 375 (E.D. Pa. 2024), appeal dismissed as moot sub nom; *Pepper v. Attorney General Pennsylvania*, No. 24-1261, 2024 WL 5100638 (3d Cir. Dec. 13, 2024).

43. In that action, the United States District Court declared the Educator Discipline Act's confidentiality restriction unconstitutional as applied to James Pepper and permanently enjoined the Bucks County District Attorney from prosecuting him for speaking about his educator-misconduct complaint. James Pepper thereafter publicly discussed the complaint and his criticism of the governmental response to educator misconduct.

44. Thus, before the events at issue here, James Pepper had an established and publicly known history of speaking about school governance, advocating for students with disabilities, petitioning governmental bodies, pursuing IDEA remedies for his children, challenging educator misconduct, and resorting to litigation when necessary to protect his children and vindicate constitutional rights.

45. Defendants knew, or reasonably understood, that truthful disclosure to Parents of allegations that J.P. was being abused by District personnel would cause Parents—particularly James Pepper—to advocate, petition, seek outside investigation, speak publicly, and pursue legal remedies. Upon information and belief, that history supplied a substantial and motivating reason for Defendants' decision to conceal and materially mischaracterize the allegations concerning J.P.

46. The retaliatory treatment alleged herein was not limited to criticism or disagreement with Parents. Defendants withheld from Parents the existence and substance of allegations that their nonverbal child was being abused; affirmatively characterized the matter as a mere "personality conflict;" reassured Parents while leaving the accused employees in control of J.P.; concealed corroborating investigative information; and later issued and repeated false assurances that the District had found "no evidence of abuse." These acts deprived Parents of information necessary to protect J.P. and caused or prolonged J.P.'s exposure to the persons accused of abusing him.

47. A person of ordinary firmness in Parents' position could be deterred from continued advocacy, petitioning, litigation, and public criticism by governmental conduct that responds to such advocacy by withholding critical safety information concerning the advocate's disabled child, misleading the advocate about reported abuse, and thereby placing the child at continued risk.

48. Parents nevertheless continued to advocate after learning the truth. Their persistence does not eliminate the retaliatory character of Defendants' conduct or the injuries caused by it.

49. The protected activity most directly relevant to the retaliation claim was undertaken by Parents as parents and private citizens, not merely as part of James Pepper's service on the School Board. It included the IDEA due-process proceeding concerning J.P. 2, complaints and advocacy concerning special-education services, the educator-misconduct complaint filed with the Pennsylvania Department of Education, and the federal First Amendment action concerning James Pepper's ability to speak publicly about educator misconduct.

50. The federal First Amendment action produced a published decision in January 2024 declaring the Educator Discipline Act's confidentiality restriction unconstitutional as applied to James Pepper and permanently enjoining the Bucks County District Attorney from prosecuting him for speaking about his educator-misconduct complaint. The decision and James Pepper's subsequent public discussion of educator misconduct preceded the November 2024 reports concerning J.P. and reinforced Defendants' knowledge that withholding or minimizing serious educator misconduct would predictably provoke additional petitioning, litigation, and public criticism if Parents learned the truth.

ii. *Room 119*

51. At all times relevant, J.P. was assigned to the full-time special education autistic support classroom. The classroom was located in Classroom 119 ("Room 119") of Jamison Elementary School. Defendant Gabrielle McDaniel was the teacher assigned to the classroom.

52. The staff in J.P.'s classroom during both the 2023-2024 and 2024-2025 school years included McDaniel, who was both the special education teacher and supervisor in charge of

all activities and staff assigned to her classroom and Defendant Rachel Aussprung, an educational assistant assigned to the classroom during this time period.

53. Alyssa Kline ("Kline") was a one-to-one behavioral aide assigned to J.P. who also worked in Room 119.

54. The 2024-2025 academic year was the first year Kline was assigned as a one-to-one for J.P. The 2024-2025 academic year was the first time Kline had worked in the CBSD.

55. Kline previously worked as an autistic support aide at the Upper Dublin School District.

56. In addition to Kline, Vanessa Carey ("Carey"), a District Board-Certified Behavior Analyst ("BCBA"), also worked in Room 119 at the start of the 2024-2025 academic year. A BCBA is the individual responsible for development of a student's behavioral programming and oversees implementation of each student's Positive Behavior Support Plan[1] ("PBSP"). The 2024-2025 academic year was the first that Carey was assigned to Room 119 or to work with J.P.

57. All the children in the Jamison classroom were nonverbal. J.P's assistive technology "talker" facilitated only one or two word preset phrases and did not provide the means for him to relate the events taking place in Room 119 to Parents. The same is true for other students in Room 119.

58. Defendants relied on the students' disabilities to shield their activities from outside knowledge.

59. CBSD, its employees and agents, engaged in an ongoing practice of directly mistreating J.P., knowingly and deliberately withholding the program and supports necessary for

[1] A PBSP, mandated by state and federal law, is a non-punitive, positive intervention and instruction plan for students with disability-related behavior that interferes with learning. "Positive, rather than negative, measures must form the basis of behavior support programs to ensure that all students…shall be free from demeaning treatment, the use of aversive techniques and the unreasonable use of restraints." 22 Pa. Code §14.133(a).

him to participate in and receive the benefits of his public educational program, and otherwise discriminated against him because he is disabled.

60. CBSD mistreatment of J.P., by and through its employees and agents, included punitive discipline, punishment for symptoms of his disability, unlawful restraint, corporal punishment and intentional infliction of pain, demeaning treatment, sex-based ridicule, withholding of water, and other abuses in violation of the laws of the Commonwealth and the protections afforded to him under the United States Constitution as illustrated below.

61. None of the actions detailed herein were authorized by J.P's behavior plan or IEP.

62. As trained educators, Defendants McDaniel and Aussprung knew, or should have known, their actions were unlawful.

63. The Defendants knew the actions described herein were unlawful.

64. Defendants' actions toward J.P. were unwelcome, severe, pervasive, and objectively offensive to any reasonable person, and constituted sexual harassment.

65. J.P. was not competent to consent to sex-based behavior or exposure.

iii. *Jamison Elementary*

66. Defendant David Heineman was the principal of Jamison Elementary for both the 2023-2024 and 2024-2025 academic years. He was a frequent visitor to J.P.'s classroom.

67. In Pennsylvania, certain individuals are required to report to ChildLine any time they have a suspicion that a child has been or is being abused. They are commonly referred to as "mandated reporters."

68. 23 Pa.C.S.A. § 6311(b) and (c) require that staff members (like teachers or other individuals that regularly interact with children of institutions like public schools) must make a

report of suspected child abuse if that person has reasonable cause to suspect a child is the victim of child abuse.

69. 23 Pa.C.S.A. § 6303(b.1) defines "child abuse" in pertinent part as:

> "(b.1) Child abuse – The term "child abuse shall mean intentionally, knowingly, or recklessly doing any of the following: (1) Causing bodily injury to a child through any recent act or failure to act…; (3) Causing or substantially Contributing to serious mental injury or to a child through any act or failure to act or a series of such acts or failures to act….(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act…; (7) Causing Serious physical neglect of a child; (8) Engaging in any of the following recent acts: (ii) Unreasonably restraining or confining a child, based on consideration of the method, location or the duration of the restraint or confinement."

70. Despite these very clear legal requirements, there has been in place, since at least 2023, a policy at CBSD and Jamison Elementary that administrators be given "final approval" over the filing of ChildLine reports.

71. As evidence of same, on November 2, 2023, Defendant Heineman sent out a school wide directive to all staff at Jamison Elementary that all ChildLine reports had to come through him for "final approval" and to "speak with (him) prior to reporting." The email reads in its entirety:

**From:** HEINEMAN, DAVE
**Sent:** Thursday, November 2, 2023 9:22 AM
**Subject:** Child and Youth

**Importance:** High

Good morning,

I realize we have not spent time directly discussing C&Y referrals, which is an error on my part, and I will be sure that we do so more in depth soon. However, please know that before a referral is made from the school, I must be made aware and give final approval. Believe me, I do not see myself as a micromanager, but with this, I need to know in advance. We are all mandated reporters who must look out for the welfare of our students. When it comes to making a referral, I need to know so when parents contact me or C&Y shows up at school, I can speak of the situation. C&Y referrals are "*supposed*" to be anonymous, but through my experience, parents are often told that the school filed the report. When a parent tells me that they know a report came from the school, I tell them it was me.

Once again, one of our top priorities is the safety and wellbeing of our students. As mandated reporters, we have a legal obligation to report abuse. Our jobs are not to investigate, our jobs are to report. Just speak with me prior to reporting.

If you have any questions or concerns, please stop by.

Dave

David A. Heineman - Principal
Jamison Elementary School - Central Bucks School District
2090 Land Road
Jamison, PA 18929
267-893-3500
dheinema@cbsd.org

72. Instead of encouraging teachers, staff, and other mandated reporters to fully and faithfully follow the law, Defendant Heineman cryptically threatened that, while ChildLine reports *should* be anonymous, they frequently are not. Heineman painted a picture of parents angry that teachers would attempt to protect children by filing ChildLine reports when required. Heineman, at the direction of CBSD, spoke from both sides of his mouth, reminding teachers and staff of their obligation to report but ordering them to report only after getting approval from him.

73. When Defendant Yanni assumed the role of Superintendent at the start of the 2024 academic year, he was aware of, and endorsed, this abhorrent and illegal policy.

iv. *The abuse of J.P.*

a. <u>2023-2024 Academic Year</u>

74. The first currently known incident of abuse suffered by J.P. occurred during the 2023-2024 academic year.

75. On February 28, 2024, J.P. collided head-to-head with an adult art aide during the school day. The collision was sufficiently severe that the adult aide was later diagnosed with a concussion and missed approximately ten weeks of work. Notwithstanding the severity of the impact and J.P.'s inability to self-report symptoms, no one associated with CBSD or any of the individual Defendants sent J.P. to the school nurse. No one obtained any medical evaluation. No one notified J.P.'s parents.

76. By failing to secure medical assessment or make parental notification following a known head injury, CBSD breached mandatory, non-discretionary student-safety duties and foreclosed timely diagnosis or treatment. Any uncertainty regarding the extent of J.P.'s injury exists solely because CBSD failed to obtain medical care or inform his parents, and this failure reflects a broader pattern of minimizing injuries to disabled students rather than protecting their health and safety.

77. In the nights following this incident, J.P. was up all hours of the night and was very agitated. Nonverbal, he could not communicate with his parents what was wrong.

78. J.P.'s parents only found out about the head collision incident and resulting concussion for the art aide on December 21, 2024.

79. A subsequent investigation by Bucks County Children and Youth's determined that Defendant McDaniel's failure to seek medical treatment for J.P. on February 28, 2024, constituted substantiated child abuse.

b. <u>2024-2025 Academic Year</u>

80. Kline was hired to be J.P.'s Personal Care Aide ("PCA") or "one-to-one" at Jamison Elementary for the 2024-2025 academic year.

81. At the time she began working in Room 119, Defendants McDaniel and Aussprung "warned" Kline about Parents. Defendants McDaniel and Aussprung informed Kline that Parents had "sued the School District" before. As noted above, Parents had previously pursued a Due Process Hearing under the Individuals with Disabilities Education Act for J.P.'s older brother, who also is diagnosed with nonverbal autism.

82. At one point, Defendant McDaniel reported to Kline that she was suspicious that J.P.'s parents had planted a listening device on his talker so that they could surveil Room 119 and bring litigation against CBSD.

83. From September 3, 2024 to November 14, 2024, Alyssa Kline witnessed J.P. being relentlessly abused by both McDaniel and Aussprung.

84. Among her observations were that:

a. Defendants McDaniel and Aussprung would allow J.P. to sit in and roam around the classroom—including in front of windows—completely nude without correcting his behavior or redirecting him to get dressed;
b. Defendants McDaniel and Aussprung would allow and encourage J.P. to "self-stim" by masturbating in the classroom and in the bathroom. Defendants McDaniel and Aussprung would allow and encourage J.P. to spit on his own genitals during these periods of "self-stim" and would relentlessly mock J.P. while he "self-stimmed." Defendants McDaniel and Aussprung would often force Kline to watch J.P. as he "self-stimmed" and then make her clean him up after he was finished;
c. Defendants McDaniel and Aussprung would restrict J.P.'s water intake in an effort to force him to stop using the bathroom during the school day when they deemed he asked to use the bathroom too frequently;
d. Defendant Aussprung, at the direction of Defendant McDaniel, would unlawfully restrain J.P. as a punishment for what they perceived as negative behaviors by forcing him to sit in a chair blocked by desks that were pushed against J.P. by Defendant Aussprung's feet. Aussprung would often be on her personal cell phone while unlawfully restraining J.P.;
e. Often times, Defendants McDaniel and Aussprung would force J.P. to work naked at his desk while being restrained in the manner described above. J.P. would then soil himself as a means to get away from being restrained;
f. Defendants McDaniel and Aussprung would allow J.P. to gag himself without correcting his behavior or redirecting him which would result in J.P. being covered in his own saliva. Defendants McDaniel and Aussprung would refuse to clean J.P.

resulting in him sitting at his desk for extended period of time covered in his own saliva;

g. Defendants McDaniel and Aussprung would scream loudly in J.P.'s face and yell derogatory comments at him;

h. On one occasion J.P. removed his shoes while on the playground which upset Defendant Aussprung. In response, Defendant Aussprung took J.P.'s shoes, moved them, and forced him to walk across wood chips barefoot to retrieve his shoes.

85. Depriving access to water is a deprivation of a basic human right and it is an inappropriate aversive technique to utilize in a special education classroom under 22 Pa. Code 14.133.

86. Restraining students in spaces from which they cannot readily exit is prohibited by 22 Pa. Code 14.133(e). Restraints may only be used when the student is acting in a manner that presents a clear and present danger to the student or others around the student and only when less restrictive measures and techniques are proven to be or are less effective. Furthermore, schools are required to maintain data on the use of restraints and report same to the Pennsylvania Department of Education.

87. Corporal punishment of students is specifically prohibited under 22 Pa. Code § 12.5.

88. On one occasion, J.P. was being allowed and/or encouraged by Defendants McDaniel and Aussprung to roam the classroom naked. While Kline attempted to help him get redressed J.P. started running around the classroom and climbed onto a heater. Defendant Heineman was called to the classroom to assist and observed what was happening. Defendant Heineman did not make any efforts to investigate how or why J.P. was naked in the classroom, how long he had been naked, or how frequently events like this occurred in Room 119.

89. This was by no means the first or last time Heineman reported to Room 119. In fact, he routinely visited Room 119 during the course of his tenure and would have regularly observed at least some of the same events that Kline observed described above.

90. Indeed, teachers at Jamison Elementary reported that when they made reports of misconduct regarding Defendant McDaniel to Defendant Heineman in the past, he would immediately inform Defendant McDaniel and so teachers stopped reporting her misconduct.

91. Upon information and belief, during the 2024-2025 school year, Heineman was engaged in a romantic relationship and/or otherwise highly inappropriate relationship with Defendant McDaniel resulting in Heineman showing overt favoritism to Defendant McDaniel.

92. Defendant Heineman's favoritism went so far that he gathered PCA's and other staff at Jamison and told them that when they went to Room 119 they were "just a body" and were to listen and follow along with whatever Defendant McDaniel said.

93. On another occasion, on October 10, 2024, CBSD staff member Melissa Donofrio, a Special Education Programming Specialist, made an unannounced visit to Room 119. There she observed J.P. sitting at a desk, naked, being told to do schoolwork by Defendant McDaniel or, as McDaniel would claim, while she was "teaching" J.P. Donofrio noted other students were present. Donofrio attempted to cover J.P. with a blanket but was told by Defendant McDaniel that this was not necessary because J.P. would just disrobe again.

94. Each day, McDaniel and other staff in Room 119, made notes and recorded data provided to Parents about J.P.'s day including his behaviors or other important pieces of information. Nowhere in the notes provided to Parents for October 10, 2024, was there any mention of the details described in the immediately preceding paragraph.

95. Defendant Kathleen Veisz ("Veisz"), the District's Supervisor of Special Education and Defendant Alyssa Wright, Director of Pupil Services for the CBSD, were informed of the observations Donofrio made.

96. The following day, October 11, 2024, Plaintiff Lisa Pepper received a call from Defendant Veisz informing her that the day before, J.P. was found in the classroom nude during instruction by Defendant McDaniel. Defendant Veisz told Plaintiff Lisa Pepper that this was inappropriate because it did not occur in a "clinical setting." Defendant Veisz couched the explanation of this incident as a mere "training" issue with Defendant McDaniel and that McDaniel would be educated regarding the difference between clinical and classroom settings and the inappropriate nature of her behavior.

97. Defendant Veisz requested to meet with Parents via Zoom the following Monday, October 14, 2024.

98. Plaintiff Lisa Pepper attended the Zoom meeting. Defendant Veisz was present along with Donofrio and a number of other individuals, some of whom Plaintiff Lisa Pepper does not remember and others she had never met before that day. Not present was Defendant McDaniel. The same assurances Veisz offered during the October 11, 2024, telephone call were repeated. Parents believed the explanations offered by Veisz and CBSD and trusted that CBSD had J.P.'s was working with J.P.'s best interests in mind.

99. Parents never discussed this incident with Defendant McDaniel.

100. In fact, no one at CBSD addressed this incident with Defendant McDaniel.

101. At or around the same time, Defendant Wright was receiving reports from Carey (a BCBA assigned to Room 119) about "ongoing concerns" she had about Defendant McDaniel's conduct. This included reports that J.P. was allowed to roam the classroom naked, masturbate in

the classroom, remain seated on the toilet for 45 minutes at a time, and that Defendant Aussprung would move tables around J.P., "restricting his movement," in an effort to get him to "focus on work."

102. Carey communicated these concerns on an "ongoing basis." Despite these reports, and the fact that the reports by Carey corroborated the report by Donofrio (and vice versa), Defendants Wright and Veisz and every other individual CBSD defendant responsible for the care of J.P. and making mandated reports by law, completely failed to act or intervene to protect J.P. from ongoing abuse.

103. Although J.P.'s parents were informed of this incident, they were not told that it was part of a regular practice in which J.P. was kept naked for significant portions of the school day and subjected to ongoing abuse by Defendants McDaniel and Aussprung.

104. Instead, J.P.'s parents were told that it was a "mistake" and that Defendant McDaniel was alone responsible.

105. Despite this knowledge, District officials failed to take prompt or effective action to protect J.P., failed to disclose the full scope and duration of the abuse to J.P.'s parents, and allowed Defendants McDaniel and Aussprung to continue working in the classroom, thereby permitting the ongoing deprivation of J.P.'s rights to persist.

106. As Kline continued observing the abusive behaviors described herein, she was also being told by Defendants McDaniel and Aussprung that the way they operated the classroom was normal and in line with the way CBSD authorized the classroom to operate. Defendants McDaniel and Aussprung told Kline that the way J.P. behaved, and the way they treated J.P., was consistent with the year before and, perhaps worse, effective at controlling his behaviors. As time went on, however, Kline no longer believed that the way Defendants McDaniel and Aussprung treated J.P.

was effective at controlling his behaviors and, instead, observed the traumatic effects the abuse was having on J.P.

107. In early November, Kline discussed what was happening with her husband and began appreciating the emotional toll that observing this daily abuse and mistreatment was having on her.

108. On or about November 13, 2024, Kline spoke with Defendant McDaniel and requested to meet with her and Defendant Heineman.

109. Defendant McDaniel instead insisted on speaking with Kline that same day. Kline avoided speaking in detail to Defendant McDaniel. Kline believed that she would be meeting with Defendants McDaniel and Heineman the next morning, November 14, 2024, at the start of the day.

110. Instead, at the very beginning of the day on November 14, 2024, Defendant McDaniel met with Kline privately in Room 119 and berated Kline causing Kline to become emotional and cry. Defendant McDaniel ultimately told Kline that Room 119 was her classroom and she would run it as she sees fit.

111. That same morning Kline sought out Defendant Heineman directly. When Kline met with Defendant Heineman he insisted that a union representative be present. Kline did not trust Heineman and explained to Heineman how she felt Defendant McDaniel was preventing Kline from properly doing her job.

112. Instead of making any attempt to learn more about Kline's experiences, or inquire about her obvious emotion and discomfort, Heineman told the union representative present for the meeting that he "could get [Kline] fired" for "not going along" with McDaniel's directions in the classroom.

113. After the meeting concluded, Kline divulged to the union representative that she had more to say and needed someone to confide in. The union representative directed Kline to Deneen Dry ("Dry"), a senior official in the union.

114. That evening Kline spoke with Dry via phone to disclose the abuses she had observed in Room 119. Before Kline could finish Dry told Kline it was necessary that they schedule a meeting with Human Resources so Kline could inform Human Resources about what she was observing.

115. On or about November 15, 2024, Kline met with Dry and Defendant Christine Trawinski, Human Resources Manager for CBSD.

116. Defendant Trawinski interviewed Kline and recording notes of the meeting.

117. Defendant Trawinski's notes included the following:

Meeting with Alyssa Kline on Friday, November 15, 2024. Deneen Dry was also present.

**Alyssa reported the following issues in the classroom:**

Student J.P. was allowed to:

- sit naked on the rug in the classroom.
- self-stim in his workstation, sometimes using his spit on his genitals.
- sit naked at his workstation.
- go to the bathroom to disrobe and masturbate sometimes 3-4 times a day.
- walk naked from his workstation to the bathroom to be redressed.

**Alyssa shared the following observations regarding students:**

Student J.P. has stood naked at the window in the classroom.

J.P. is restricted from having water – per Gabby's direction he is not allowed to use the water fountain, his water bottle is kept away from him. Alyssa stated that once when she was escorting J.P. to a special, she stopped him from using the water fountain in front of a therapist. The therapist was very surprised to hear that his water intake was limited. J.P. will frequently try to drink from the sink. Alyssa believes that the restriction is an effort to limit J.P. from urinating, Gabby has stated "I'm not dealing with this" regarding J.P. urinating in the classroom.

As a punishment for negative behaviors, J.P. is made to sit in his workstation with the triangular table set up against the back of his chair. EA Rachel places her feet on the table legs to prevent J.P. from moving. The situation continues for a long time, during which Rachel is on her personal cell phone. Student S. is also made to sit in his workstation with a table behind him and the EA holding it in place.

J.P. has gagged himself at his workstation and spread his spit over himself and the table. He was made to sit in the spit for 30 minutes while he finished his lesson.

J.P. uses the "comfy chairs" in the room to lay face down on and self-stim. Part of his body is on one chair; his face is on another. Gabby has pulled the chair from under his face to force him to roll over.

Gabby and Rachel frequently scream very loudly at J.P.

Alyssa is made to stand in the bathroom while J.P. masturbates, then must clean and redress him.

Gabby and Rachel scream "put your teeth away" to J.P. After a meeting with J.P.'s parents, they mentioned that they knew about the comment. When Gabby returned to the classroom, she acted paranoid and said that she was concerned the talker was bugged because she did not know how they knew about the phrase.

> On the playground J.P. removes his shoes. EA Rachel does not want him to do that, takes his shoes and moves them to the slide to force J.P. to walk across wood chips to get his shoes. She said, "that will teach him to take his shoes off."
>
> Another student was made to sit for 45 minutes on the toilet for "toilet training". She was not allowed to go to recess.
>
> Students J.P. and S. hit other students so much they flinch when J.P. and S. are nearby. Once a student was hit so hard it left a red hand mark on their back, Alyssa believes no report was made.
>
> A student was crying for so long they vomited. Gabby told the mom the student was sick during the day, but did not talk about the prolonged crying.
>
> A student was crying uncontrollably for 35 minutes. Alyssa finally picked the child up and rubbed their back, and they stopped crying. Alyssa was reprimanded for picking up the child.

118. On November 15, 2024, at approximately 12:00 PM, Defendant Robert Freiling, then Director of Human Resources for the CBSD met with Defendant Steven Yanni, then Superintendent of the CBSD and reported that Defendant Trawinski had met with Kline. He further reported that Defendant Trawinski and Defendant Nadine Garvin, then Assistant Superintendent for elementary schools for the CBSD, were going to Jamison Elementary to do "fact finding."

119. As part of that "fact finding" on November 15, 2024, Defendants Freiling, Heineman, Garvin, and Veisz interviewed Defendant McDaniel. Defendant McDaniel's union representatives at that meeting were Central Bucks Education Association ("CBEA") Union President Defendant Cara Alderfer and Jamison building representative Defendant Kathy Moelter. Both Alderfer and Moelter are also teachers employed by CBSD.

120. During the meeting with Defendant McDaniel, the specific allegations of abuse and neglect raised by Kline were discussed.

121. Both Defendants Alderfer and Moelter were mandatory reporters of child abuse in the Commonwealth of Pennsylvania.

122. As such, both Defendants Alderfer and Moelter were legally required to immediately report suspected child abuse if they had reasonable cause to suspect that a child was a victim of child abuse. See 23 Pa. C.S.A. § 6311.

123. Nevertheless, neither Defendant Alderfer nor Defendant Moelter contacted ChildLine to report any allegations of abuse.

124. As CBSD teachers, Alderfer and Moelter were required under Pennsylvania law to contact ChildLine if they had a reasonable suspicion of child abuse. There is no exception under Pennsylvania law if you learn of the suspected child abuse while acting as a union representative.

125. After learning specific allegations of ongoing child abuse, Defendants Alderfer and Moelter knowingly joined District administrators in an agreement to leave both accused adults in direct control of J.P. and the other nonverbal children, despite their own mandated-reporting duties and the foreseeable risk of continued abuse.

126. Notwithstanding the detailed allegations that Defendants McDaniel and Aussprung had physically restrained, deprived J.P. of water, corporally punished J.P., and sexually degraded J.P., Defendants Alderfer and Moelter expressly agreed with District administrators that neither Defendant McDaniel nor Defendant Aussprung would be removed or placed on administrative leave. Acting jointly, Defendants instead permitted both accused employees to continue exercising authority and control over J.P. and the other nonverbal students in Room 119.

127. Defendants Alderfer and Moelter understood that the decision would leave J.P., a nonverbal child incapable of reporting abuse, exposed to the same adults accused of abusing him.

128. Following that, J.P. remained exposed to Defendants McDaniel and Aussprung, and suffered additional constitutional injury during that period, until his parents removed him from that classroom on December 18, 2024.

129. As such, Alderfer and Moelter's silence furthered the conspiracy of silence at CBSD related to J.P.'s abuse.

130. On November 15, 2024, at approximately 4:00 PM, a conference call was held with Defendants Yanni, Heineman, Veisz, Garvin, Freiling, Wright, and Trawinski. Garvin stated that she had expected to remove McDaniel from the classroom prior to going to Jamison but the Defendants participating in the call determined that no further action would be taken at that time. None of the Defendants filed a ChildLine report as was required by law.

131. Not only did Defendants Yanni, Heineman, Veisz, Garvin, Freiling, Wright, and Trawinski fail to file a ChildLine report, they also failed to remove either Defendant McDaniel or Defendant Aussprung from Room 119 or the school. Shockingly, instead of removing Defendants McDaniel and Aussprung from Room 119, Defendants instead removed Kline from Room 119.

132. CBSD policy 806 requires that after an allegation of abuse is made, a supervision plan must be put in place. CBSD administrators, including Defendants Yanni, Heineman, Veisz, Garvin, Freiling, Wright, and Trawinski, ignored this policy.

133. Defendant Yanni was later quoted as saying "if these events had occurred in a second-grade class, then yes, the teachers would have been removed." Said differently, Defendant Yanni, the person ultimately responsible for administering policy and keeping children—*all children*—within CBSD safe determined that because Room 119 was "just" an Autistic Support Classroom, and not a "normal" second-grade classroom, the vulnerable children attending school in Room 119 were less worthy of protection.

134. It was further decided by Defendant Yanni that Defendant Freiling would continue "fact finding" at Jamison Elementary the following Monday, November 18, 2024.

135. Though charged by Defendant Yanni to lead CBSD's investigation into the allegations of child abuse, Defendant Freiling had no training in child abuse or the child abuse reporting requirements.

136. Defendant Freiling has since admitted under oath that he was not qualified to make any of the determinations arising out of the investigation that Yanni tasked him with doing. Indeed, Defendant Freiling did not even view his purpose as conducting a child abuse investigation because he, as he has since admitted, was wholly unqualified and unprepared to conduct such an investigation.

137. CBSD opened the "investigation" into Kline's allegations as a "personnel matter" to cover-up any child abuse that may have been discovered.

138. On November 16, 2024, Trawinski sent her notes from her meeting with Kline to Defendants Yanni, Garvin, Freiling, Heineman, Wright, and Veisz.

139. Incredibly, and as part of the overall scheme perpetrated by the Defendants to conceal the abuse at issue here, this email was concealed from Parents, the Disability Rights Project of Pennsylvania, and the CBSD Board by Defendants Yanni, Garvin, Wright, Heineman, Trawinski, and Veisz until July 17, 2025, when it was discovered by CBSD's newly hired solicitor Peter Amuso.

140. Defendants Trawinski, Yanni, Garvin, Freiling, Heineman, Wright, and Veisz were all mandatory reporters of child abuse in the Commonwealth of Pennsylvania.

141. The allegations in Trawinski's notes clearly constituted allegations of child abuse that, by law, should have been reported to ChildLine.

142. On November 18, 2024, CBSD interviewed multiple staff who corroborated Kline's allegations of abuse.

143. On November 18, 2024, CBSD received a seven-page document from Kline detailing her allegations against Defendants McDaniel and Aussprung. The document mirrored what Kline had reported to Defendant Trawinski.

144. Contained within this document were the following allegations of abuse. The document reported that Defendants McDaniel and Aussprung would:

a. Leave J.P. in the bathroom naked to masturbate from 5 to 30 minutes at a time multiple times a day;
b. Mock J.P. while he masturbated;
c. Describe his time naked in the bathroom as "he's face down on tile;"
d. Mock J.P.'s genitalia;
e. Allow J.P. to be naked for prolonged periods of time in the classroom;
f. Allow J.P. to stand naked on the windowsill (while Defendant Heineman was present);
g. Allow J.P. to be naked in the sensory room;
h. Allow J.P. to be naked and masturbate at his workstation;
i. Repeatedly restrain J.P. in his chair;
j. Mock and ridicule J.P. while he grabbed his genitalia;
k. Pull a couch out from under J.P. causing J.P.'s head to hit the floor;
l. Forcefully grab, drag, and yank of J.P.;
m. Restrict J.P.'s water;
n. Deny J.P. bathroom breaks;
o. Remove of J.P.'s communicative device as punishment;
p. Restrain J.P. as punishment;
q. Restrain, isolate and restrain him on a bench in the school vestibule as punishment and joke that "the vestibule is calling his name;"
r. Force J.P. to walk over woodchips if he took his shoes and socks off while Defendant Aussprung commented "[I] bet you won't take your shoes off again" and "I bet those wood chips don't feel good"); and
s. Engage in two-minute bear hug restraints if J.P. took his socks and shoes off.

145. Despite the receipt of this document and the corroboration of these allegations of abuse, CBSD failed to remove Defendants McDaniel and Aussprung from the classroom thus enabling them to continue to abuse J.P. and the other nonverbal children in the classroom.

146. In fact, CBSD and Defendant Veisz actually made the determination that Defendants McDaniel and Aussprung should spend *more time* with J.P. In an email to Parents, Defendant Veisz recommended that Defendants McDaniel and/or Aussprung accompany J.P. to therapy sessions held outside the classroom.

147. Furthermore, as of November 18, 2024, no ChildLine report had been made by anyone at CBSD who knew about the allegations of abuse (including Defendants Yanni, Garvin, Freiling, Trawinski, Heineman, Wright, Veisz, Alderfer, and Moelter).

148. On November 21, 2024, Parents had their monthly meeting with Defendants McDaniel, Heineman, Veisz, and others responsible for J.P.'s education.

149. Parents were told nothing about the allegations of abuse leveled by Kline against Defendants McDaniel and Aussprung on November 14, 2024.

150. Despite Defendants Heineman and Veisz knowing the detailed allegations of abuse and the fact that CBSD itself has corroborated these allegations of abuse at least as of November 18, 2024, Parents were only told that Kline was no longer J.P.'s personal care aide because of a "personality conflict" between Kline and Defendant McDaniel.

151. During this same period, and before Parents removed J.P. from Room 119, Defendant Yanni personally reinforced the same false narrative to James Pepper by characterizing the matter as a "personality conflict" and assuring him that there was nothing to be concerned about, despite Yanni's receipt and review of the detailed allegations concerning J.P.

152. James Pepper believed and relied upon Yanni's reassurance. Had Yanni or the other Defendants truthfully disclosed that a District employee had reported that J.P. was being repeatedly restrained, deprived of water, left naked, mocked, punished, and otherwise abused, Parents would have immediately removed J.P. from Room 119 and sought protective intervention. Instead,

because Defendants concealed the abuse allegations and affirmatively supplied a benign explanation, Parents left J.P. in the classroom until December 18, 2024.

153. Meanwhile, the daily abuse J.P. suffered, as reported by Kline on November 14, 2024, continued.

154. Concerned that Defendants McDaniel and Aussprung were still in the classroom with four nonverbal children with autism after having made detailed allegations of abuse, Kline contacted Freiling on November 20, 2024.

155. In her email, Kline asked whether a ChildLine report had been filed, expressing that she had not filed a report herself because she went to Human Resources. Kline asked why Defendants McDaniel and Aussprung were still permitted to work with the children in Room 119. Kline asked if any of the parents of the children in Room 119 knew of the allegations. Kline asked whether James Pepper was told why she was removed from the classroom and not Defendants McDaniel or Aussprung. Lastly, Kline asked whether she should file a ChildLine report herself.

156. Rather than respond to Kline's email, Defendant Freiling directed Kline, through her union leadership, that the complaint was being handled through the proper channels and to not file a report herself.

157. Freiling then attended a series of committee meetings in the evening where Defendant Yanni was also present. Defendant Yanni was surprised to see Defendant Freiling at these committee meetings.

158. Defendant Freiling told Defendant Yanni that they needed to talk. Defendant Yanni told him they could meet privately after the last committee meeting ended.

159. Defendant Freiling gave to Defendant Yanni the seven-page document Kline had provided to Defendant Freiling on November 18, 2024.

160. Defendant Yanni reviewed the seven-page document Kline had authored.

161. After the committee meetings, and as a result of Kline's email, Defendants Yanni, Freiling, Wright, and Garvin met. Defendants decided to file a ChildLine report.

162. Rather than file an accurate ChildLine report, Defendants Yanni, Freiling, and Garvin submitted a willfully false ChildLine report in a continued effort to cover up J.P.'s abuse.

163. Dated November 20, 2024, and time stamped at 10:39 PM, Defendants Yanni, Freiling, and Garvin and CBSD reported the abuse already described herein as:

TYPE OF MALTREATMENT/NATURE OF MALTREATMENT?

Speaking inappropriately to student; pushing/grabbing student

ADDITIONAL INFORMATION

Additional Information about Mandated Reporter's Source of Knowledge: A Personal Care Aide reported some behaviors of an autistic support teacher may have engaged in behaviors that could constitute abuse.

Do you suspect that the alleged perpetrator was impaired when the alleged incident occurred: No

Additional Information: Alleged perpertrators are employed by the Central Bucks School District. This referral is being made on behalf of Dr. Steve Yanni, Dr. Nadine Garvin, Mr. Rob Freiling.

Reporter eSignature: Steven Yanni

164. Not only did the ChildLine falsely omit numerous acts of child abuse that were reported by Kline and others, but it identified only Defendant Aussprung as an alleged perpetrator, not Defendant McDaniel.

165. As a result of the ChildLine Report, Warwick Township Police contacted Defendant Yanni on November 21, 2024.

166. Defendant Yanni falsely told Warwick Township Police that the allegations were the result of a "personality conflict" between Defendant Aussprung and Kline.

167. Defendant Yanni falsely told Warwick Township Police that Defendant Aussprung had been removed from Room 119 when in fact Kline had been removed.

168. Defendant Yanni falsely told Warwick Township Police that there were no concerns of abuse.

169. Warwick Township Police repeatedly followed up with Defendant Yanni to have him provide to Warwick Township Police any documentation from CBSD's investigation. Defendant Yanni failed to timely respond to Warwick Township Police.

170. Defendant Yanni would later claim that he did not include the full scope of Kline's reports of child abuse because he was unable to "attach" either the summary of her interview with Trawinski or the seven-page document Kline had provided to the ChildLine report.

171. Defendant Yanni has never explained why he did not simply provide either or both to Warwick Township Police when they contacted him in November 2024.

172. In reality, this is because Defendant Yanni, along with CBSD and the other Defendants, were actively engaged in a conspiracy to bury the reports of child abuse they had received.

173. None of the Defendants or anyone associated with CBSD ever told Parents about any of the allegations reported by Kline or "investigated" by CBSD.

174. In fact, Defendant Yanni has testified under oath that one of the matters he wanted to focus on "upon the start of 24-25 school year" was "to keep [CBSD] out of the newspaper."

175. CBSD's policy of requiring mandated reporters to seek approval for the filing of ChildLine reports, CBSD's conduct in conspiring to and, at least for a time, successfully covering up J.P.'s abuse, CBSD's willfully false ChildLine report of November 20, 2024, Defendant Yanni's refusal to cooperate with law enforcement by timely providing information regarding its investigation, and CBSD's refusal to truthfully describe the allegations made by Kline to Parents all support Yanni's stated goal of keeping CBSD "out of the newspaper."

176. The same policies, customs, decisions, and ratification also caused the deprivation of James and Lisa Pepper's Fourteenth Amendment right to familial integrity and parental decision-making and James Pepper's First Amendment rights. The District's concealment and affirmative misrepresentations prevented Parents from making informed safety decisions for J.P. and, as alleged herein, were undertaken in substantial part to suppress, deter, or avoid the advocacy, petitioning, litigation, and public scrutiny that Defendants knew truthful disclosure to James Pepper would provoke.

177. To the extent the challenged conduct was directed, approved, or ratified by a final policymaker—including Defendant Yanni within authority delegated to him for day-to-day administration, student safety, complaint handling, and communications, and/or the Board after receiving notice—the resulting constitutional injuries are attributable to CBSD under 42 U.S.C. § 1983.

178. On December 12, 2024, BCBA Carey sent an email to Defendants Wright and Veisz to express her concerns about Defendants McDaniel and Aussprung's treatment of J.P. Carey wrote that when it came to McDaniel in particular, she was "concerned with her around children period."

179. Also on December 12, 2024, Defendant Freiling – who has admitted he was not qualified to investigate Kline's reports of child abuse – issued CBSD's investigative report into Kline's allegations of child abuse.

180. Defendant Freiling's Memorandum was addressed to Defendants Yanni, Garvin, Wright, Heineman, Trawinski, and Alderfer as well as Deneen Dry and Theresa Everett.

181. The Memorandum did not contain a summary or recitation of the reports made by Kline.

182. The Memorandum did, however, list a number of "validated concerns" relating to Kline's reports. The Memorandum confirmed:

a. Multiple reports that J.P. was allowed to roam the classroom and surrounding areas nude, engage in "self-stimulatory behavior," and that Defendants McDaniel and Aussprung would do nothing to stop or redirect this behavior;
b. Multiple reports that J.P. was restricted from accessing water;
c. Multiple reports of Defendant Aussprung restraining students using desks and by sitting upon or placing her feet on the legs of the desks to achieve the restraints;
d. Multiple reports of Defendants McDaniel and Aussprung yelling at the special needs students in their care;
e. Multiple reports of Defendants McDaniel and Aussprung making inappropriate comments and mocking students;
f. Multiple reports of unethical practices in handling student behavior and implementing interventions;
g. Multiple reports of a "close relationship" between Defendants McDaniel and Heineman and of Defendant Heineman showing "favoritism" toward Defendant McDaniel.

183. Rather than terminate either Defendant McDaniel or Defendant Aussprung after confirming the truth of numerous aspects of Kline's reports of abuse, Defendant Freiling and CBSD recommended, *inter alia*, increased supervision and required mandatory reporting training. Neither Defendant Freiling nor anyone else associated with CBSD even suggested that Defendants McDaniel and Aussprung be removed from Room 119 or any other special needs classroom.

184. While Parents began demanding more information about what the school knew, was investigating, and had learned, CBSD persistently refused to provide Parents information about their own son and the abuse that he suffered.

185. CBSD's position was that because it was a "personnel" matter Parents were not entitled to any information from the investigation including information about what happened to their son J.P.

186. On December 19, 2024, Defendant Freiling sent a letter to J.P.'s parents that falsely stated, in emphasized, bold lettering, "Throughout the investigation, we found no evidence of abuse." The letter stated that all the investigation found were "instructional concerns."

187. Defendant Freling later admitted under oath that he "regretted" signing the letter but that he felt pressured to do so by Defendant Yanni and then-CBSD solicitor attorney Edward Diasio ("Diasio").

188. Defendant Yanni testified that he drafted the letter but that the letter was approved by both Diasio and CBSD special education attorney Thomas Warner ("Warner") and reviewed by Defendants Veisz and Wright.

189. In fact, Diasio's own redacted billing records from December 19, 2024, corroborate Defendant Yanni's claim:

| | | | | | |
|---|---|---|---|---|---|
| | | STEPS. | | | |
| 12/19/24 | EAD | [redacted] TELEPHONE CALLS AND EMAILS WITH S. YANNI, A. WRIGHT, R. FREILING, AND TOM WARNER RE: [redacted] | 0.70 | 180/HR | 126.00 |

190. Incredibly, and even though the District itself has conceded in a court filing in a separate pending matter that Warner was involved in the review of the December 19, 2024 "no abuse" letter to James and Lisa Pepper, the District re-hired Warner's law firm Sweet, Stevens & Katz on March 12, 2026 to "provide legal advice primarily in the area of special education" with "an estimated expense" of $600,000.

191. When James Pepper questioned CBSD's decision to issue the December 19, 2024, letter instead of providing redacted investigative materials related to J.P., Defendant Yanni interjected in the email chain. Defendant Yanni, who for weeks had allowed J.P. and other students to remain in the care of Defendants McDaniel and Aussprung despite having received multiple

reports of child abuse, wrote that he "would never jeopardize the safety and well being of students" and that he considered CBSD kids "my kids."

192. Yanni subsequently emailed James Pepper and reported that the only investigative information related to J.P. that CBSD's investigation revealed was multiple reports of J.P. being undressed and engaging in self-stimulatory behavior and instances of water restriction, which Defendant Yanni claimed were merely instances of redirecting J.P. away from the water fountain when he would stay there for long periods of time.

193. Not only was Yanni's description of the allegations of water restrictions patently false but he willfully omitted that the investigation revealed J.P. had been: restrained thousands of times over just three months, yelled at, been made the subject of inappropriate comments, mocking, and other unethical practices.

194. Because CBSD refused to remove Defendants McDaniel or Aussprung or implement protective measures, J.P.'s parents were forced to remove him from the classroom themselves on December 18, 2024, disrupting his education and exacerbating his emotional and developmental harm.

195. On December 21, 2024, Alyssa Kline shared the seven-page document she gave CBSD detailing J.P.'s abuse with J.P.'s parents.

196. On January 5, 2025, Defendant Yanni emailed CBSD's School Board concerning J.P.'s abuse and his knowledge of that abuse.

197. At all relevant times, the Central Bucks School Board ("Board") was comprised of nine individuals.

198. The CBSD Board President was Susan Gibson and the Board Vice President was Heather Reynolds.

199. Under Pennsylvania law, the Central Bucks School Board is the District's final policymaking authority with respect to employment decisions, discipline and removal of administrators, oversight of the Superintendent, and the establishment of policies governing student safety and special education services. The Board's authority is not advisory and is not subject to meaningful review by any higher municipal entity. Acting through a majority vote or a knowing refusal to act, the Board exercises final, unreviewable discretion over whether to discipline senior administrators, place employees on administrative leave, disclose or suppress internal investigative findings, and implement corrective measures when constitutional violations are brought to its attention. All other aspects of the operation of schools within CBSD is delegated to the Superintendent and their designees.

200. Defendant Yanni's January 5, 2025, email to the Board contained numerous false and misleading statements.

201. His email attempted to cast the report of child abuse made by Kline as innocent because she (1) did not report the abuse to Heineman and (2) did not report the abuse to ChildLine. Defendant Yanni failed to remind the board of the illegal CBSD policy in effect at Jamison Elementary, announced by Defendant Heineman and endorsed by Defendant Yanni, that all staff must seek approval from Defendant Heineman to report child abuse to ChildLine that Kline was operating under. Defendant Yanni failed to inform the Board the well-known and pervasive conflict of interest Defendant Heineman had with respect to Defendant McDaniel and his personal, inappropriate relationship with her that initially caused Kline discomfort in disclosing to him her report of abuse.

202. Defendant Yanni wrote in his email that CBSD made a ChildLine report. He failed to inform the board that (1) this ChildLine report was made only after Kline asked whether a report

would be made; (2) this ChildLine report was made after a substantial delay; (3) this ChildLine report was made after returning J.P. and other vulnerable students to the care of Defendants McDaniel and Ausssprung who had been reported by Kline for child abuse; and (4) that the ChildLine report contained false, misleading, and incomplete information.

203. Defendant Yanni falsely wrote in his email that the CBSD internal investigation did not find "any evidence of child abuse."

204. Subsequent to Yanni's false and misleading email to the Board, Plaintiff James Pepper, who was himself a member of the Board, shared with Board President Gibson and Vice President Reynolds multiple documents including Kline's seven-page summary of her reports of child abuse.

205. President Gibson shared with the Board the documents provided to her by Plaintiff James Pepper.

206. As various points from January 6, 2025, through April 23, 2025, eight CBSD Board members (President Gibson, Vice President Reynolds, and members Dana Foley, Daniel Kimicata, Jeanine Zdanowicz, Robert Duggar, Rick Haring, and Karen Smith) met in executive sessions nine times (January 13, January 26, February 10, February 19, February 20, February 23, March 1, March 31, and April 24) to discuss how the Central Bucks School District would respond to the reports of child abuse.

207. Plaintiff James Pepper recused himself from these discussions.

208. President Gibson, Vice President Reynolds, and members Foley and Kimicata voted to place Defendants Yanni, Garvin, Freiling, Trawinski, Wright, and Veisz out on paid leave pending a further investigation.

209. Members Smith, Haring, Duggar, and Zdanowicz voted to allow Defendants Yanni, Garvin, Freiling, Trawinski, Wright, and Veisz to stay full time in their positions.

210. Now with the full and complete facts of the reports of abuse, CBSD allowed Defendants Yanni, Garvin, Freiling, Trawinski, Wright, and Veisz to stay full time in their positions and chose to take no action whatsoever in the face of (1) the illegal policy requiring teachers and staff at Jamison Elementary to seek approval for filing ChildLine reports; (2) each of the individual Defendants failure to make a timely and truthful ChildLine report regarding Kline's reports of child abuse; and (3) the decision to return vulnerable students, including J.P., to Room 119 even after receiving Kline's reports of child abuse. In so doing, the CBSD Board, on behalf of CBSD, ratified the illegal actions and willful misconduct of Defendants Yanni, Garvin, Freiling, Trawinski, Wright, and Veisz.

211. On January 17, 2025, Defendant Yanni sent the entire CBSD community an email where he, again, falsely claimed that the CBSD investigation did not find "any child abuse."

212. CBSD Solicitor Amuso has since stated during legal proceedings, "to say there's no abuse is a lie, isn't true." And that is because it was, and still is, just that: a lie.

213. In response to public disclosure of the abuse suffered by J.P., on January 22, 2025, and January 23, 2025, the Pennsylvania Department of Education ("PDE") investigated the allegations of illegal restraints at Jamison Elementary.

214. By law, schools must report to PDE the use of any restraints, including the types of restraints used by Defendants McDaniel and Aussprung against J.P.

215. On February 10, 2025, PDE made the following findings (J.P. is identified by PDE as "Student 1"):

**Findings:**

1. The LEA used restraints during the 2024-2025 school year when Room 119 AS Classroom staff used desks to wedge Student 1 and Student 2 in their chairs against the wall, thereby applying physical force to them to restrain their free movement.

2. The LEA inappropriately used aversive techniques for handling behavior when Room 119 AS Classroom staff denied Student 1's access to water to deter him from urinating and put Student 1 and Student 2 in spaces from which they could not readily exit to deter them from hitting and disrobing, as prohibited by 22 Pa. Code § 14.133(e).

3. The LEA failed to report the restraints that occurred in Room 119 AS Classroom to the BSE, as required by 22 Pa. Code § 14.133(c)(5).

4. The LEA failed to follow appropriate procedures, such as conducting an IEP meeting within 10 school days of the restraints or obtaining the parents' waiver of their rights to an IEP meeting upon using restraints in Room 119 AS Classroom, as required by 22 Pa. Code § 14.133(c)(1).

5. The LEA failed to ensure that Student 1's IEP team revised his IEP, as appropriate, to address his behaviors, as required by 34 CFR § 300.324(b)(1)(ii), when the IEP team discussed the student's progress and IEP revisions during monthly communication meetings but did not revise his IEP.

6. The LEA failed to implement the PBSPs of Student 1 and Student 2, as required by 34 CFR § 300.17, when the students were restrained.

**Conclusion:**

CBSD failed to demonstrate compliance with the requirements of 34 CFR § 300.17 (related to free appropriate public education), 34 CFR § 300.324 (related to development, review, and revision of IEP), and 22 Pa Code § 14.133 (related to positive behavior support).

216. Concerning J.P., PDE found:

a. "Seven (7) interviewees witnessed two students of the five students (Student 1 and Student 2) seated at desks in Room 119 AS Classroom and the desks being used to wedge the students in their chairs against the wall, restraining their free movement and not allowing them to get out of their seats. It was reported that the desks were held in place either by staff sitting on top of the desk or staff holding the desk with their hands or feet. This was reported to happen multiple times throughout each school day and would range from 20-40 minutes in duration on each occasion. This was used to deter their behaviors of hitting and disrobing. None of the restraints were reported to BSE within the Restraint Information System Collection Program (RISC)."

b. "Four (4) Interviewees witnessed on multiple occasions, Student 1's water intake being denied or limited when the student requested a drink to reduce the frequency of urination."

c. "Three (3) interviewees reported that at the monthly communication meetings, it was determined that the water requests would be utilized as functional communication practice for Student 1, and that water would not be withheld when requested by Student 1."

217. A subsequent investigation by CBSD determined that from September 3, 2024 through December 20, 2024, J.P. was illegally restrained 2,933 times and was in a restraint position for over four hours every school day. That amounts to more than twenty-seven restraints per day,

218. This calculation did not include the number of restraints used against J.P. during the 2023-2024 academic year, since Defendants McDaniel and Aussprung repeatedly admitted to Kline that their treatment of J.P. during the 2024-2025 academic year mirrored and was identical to how they treated J.P. during the prior year, the 2023-2024 academic year.

219. Every one of these 2,933 restraints was hidden from J.P.'s parents and the PDE reporting system.

220. These restraints, however, were not hidden from CBSD or the administrators responsible for oversight of Jamison Elementary.

221. Following receipt of the PDE investigative report confirming improper aversive discipline, improper restraint, and systemic failures in the handling of abuse allegations, the Board affirmatively declined to take prompt corrective or protective action. Rather than immediately placing responsible administrators on leave, initiating transparent disciplinary proceedings, or disclosing the full scope of the misconduct to affected families, the Board ratified the District's prior handling of the allegations by maintaining senior leadership in place and allowing prior concealment, minimization, and mischaracterization of the abuse to stand. By choosing inaction after receiving authoritative confirmation of abuse and related misconduct, the Board adopted and approved the District's prior course of conduct, thereby ratifying the cover-up of abuse—and, by extension, the abusive practices themselves—as official District policy or custom for purposes of municipal liability.

222. Disability Rights Pennsylvania ("DRP") is an independent, non-profit organization and the federally authorized Protection and Advocacy organization for the Commonwealth of Pennsylvania. DRP has authority under federal law to investigate allegations of abuse and neglect and pursue remedies for rights violations against people with disabilities who are receiving

services in a facility, including students within a school setting. 42 U.S.C. § 15043(2)(A) and (B). DRP's charge in such an investigation is to determine whether individuals with disabilities have been subjected to abuse and neglect or other violations of their rights and to advocate on behalf of those individuals with the facility and other governing entities to remedy those violations.

223. On February 5, 2025, the DRP made an unannounced visit to Jamison Elementary to conduct its own investigation into the allegations of abuse of J.P. and the other children in Room 119.

224. On April 23, 2025, DRP issued its report. The results were disturbing.

225. According to the report, at least four Jamison Elementary staff members cried during their interviews regarding conditions generally at the school and observations made of Room 119 specifically.

226. Two staff members reported "that they had PTSD from being in [Room 119]."

227. One staff member reported that Defendant Aussprung bragged that she would erase "negative words" from Plaintiff J.P.'s talking device to prevent him from communicating things that occurred in the Room 119.

228. One staff member reported observing Defendants McDaniel and Aussprung "dragging" Plaintiff J.P., naked, across the room.

229. Four staff members reported that they would observe students in Room 119 crying and Defendant McDaniel would refuse to allow anyone to console the students. One staff member observed a student in Room 119 crying for two hours and suggested the student be consoled to which Defendant McDaniel replied, "we do not console or coddle here."

230. One staff member reported observing Defendant McDaniel ripping toys from the grasp of upset students knowing these toys or other devices were intended to help the students self-console.

231. Three staff members reported observing Defendant McDaniel refuse to allow students to be brought to the nurse when they engaged in self-injurious behavior or acted out against other students.

232. One staff member observed Plaintiff J.P. masturbating in class and then being dragged into the bathroom by Defendants McDaniel and Aussprung who then stood in front of the bathroom door watching while Plaintiff J.P. was allowed to continue to masturbate, naked on the bathroom floor.

233. Two staff observed Defendant Aussprung remove communication devices from students—which was the only method for nonverbal autistic students to communicate—so that said students could not communicate and then bragging about the removal "with pride."

234. Multiple staff members corroborated Kline's reports of water restrictions, unlawful and undocumented restraints, isolation, physically aggressive contact by Defendants McDaniel and Aussprung against Plaintiff J.P., Defendants McDaniel and Aussprung ignoring and/or laughing at Plaintiff J.P. when he requested to use the bathroom (and at least one staff member observing this resulting in Plaintiff J.P. soiling himself when his request to use the bathroom was not honored), Plaintiff J.P. being allowed to disrobe and not be redressed resulting in him roaming the classroom or sitting at his workstation nude for extended periods of time, and Defendants McDaniel and Aussprung yelling at and berating Plaintiff J.P.

235. Pursuant to 42 U.S.C. 15043(J)(i), DRP requested records from CBSD related to the allegations of abuse and neglect.

236. Nevertheless, CBSD failed to turn over the November 16, 2024, email to DRP.

237. Yanni, Garvin, Freiling, Wright, Heineman, Trawinski and Veisz were all interviewed by DRP. None of them turned the November 16, 2024, Trawinski email over to DRP and, instead, chose to conceal it.

238. Importantly, the DRP report indicated that Nadine Garvin refused to the answer the question whether children in Jamison Elementary were abused.

239. CBSD's solicitor Diasio was responsible for the CBSD's document production to DRP and, as such, CBSD's failure to turn over the November 16, 2024, Trawinski email to DRP.

240. In fact, Diasio's March 11, 2025 billing records indicate that Diasio received "(Jamison abuse) documents from Rob Freiling" and "produce(d) documents to Disability Rights PA."

241. To frustrate further investigation into the abuse of J.P. and the other children in that classroom and their own union leadership's involvement in the cover up of that abuse, CBEA directed its members not to talk to DRP.

242. DRP's also made a series of findings including:

a. DRP investigated allegations of abuse of students in an Autistic support classroom (Classroom) at Jamison Elementary by a Central Bucks School District (District) Teacher and Educational Assistant during the 2024/2025 school year. After interviews with relevant Jamison staff and District administrators and a review of records, DRP concludes that the allegations of abuse made by the Personal Care Assistant (PCA) in the classroom are credible and corroborated by several staff who worked in the classroom. The students in Classroom experienced abuse, neglect, illegal restraints, use of aversive techniques, and disability discrimination, as defined under applicable state and federal laws.
b. Compounding the abuse, District staff failed to comply with the Pennsylvania Child Protective Services Law which requires immediate reporting of suspected child abuse to ChildLine. Instead, District administrators filed ChildLine reports days and then weeks after receipt of information of suspected child abuse, and the information reported in both instances was incomplete and misleading. Despite flaws in the District's internal fact-finding investigation, the District's own investigation still revealed significant corroboration of the abuse in Classroom.

> Despite that corroboration, the District erroneously informed parents of students in Classroom and the local police conducting the ChildLine investigation that the District's investigation found no evidence of abuse. A culture of distrust and fear of retaliation pervades at Jamison Elementary and among District administrators regarding Classroom, which undoubtedly contributed to the lack of appropriate reporting and response by the District.

243. It was only after publication of the DRP report that CBSD placed Defendant Yanni on paid leave on April 23, 2025.

244. Defendants Wright and Veisz were placed on paid leave by the CBSD Board on May 2, 2025.

245. Defendant Yanni has since been terminated by CBSD.

246. Defendant Heineman has since been terminated by CBSD.

247. Defendant Wright has since been terminated by CBSD.

248. Defendant McDaniel has since been terminated by CBSD.

249. Defendant Aussprung has since been terminated by CBSD.

250. Defendants McDaniel and Aussprung have admitted in legal filings that all of the conduct described herein, and indeed all conduct during the period of time they were employed by CBSD, was done in the course and scope of their duties as employees of CBSD.

251. Defendants Garvin and Trawinski, both of whom participated in the concealment, minimization, and mishandling of substantiated abuse allegations involving J.P. and other nonverbal students, were both permitted to retire quietly without findings, sanctions, or corrective measures.

252. In Defendant Garvin's case, the Board affirmatively approved an early retirement that violated material terms of her employment contract, including provisions governing discipline and accountability, thereby conferring a benefit in lieu of consequences.

253. The Board's decision to allow Garvin and Trawinski to exit the District without discipline, despite full authority to act, constituted ratification of their misconduct and signaled institutional approval of their actions, transforming individual wrongdoing into official District policy and rendering the District liable for the resulting constitutional violations.

254. The CBSD Board's decisions, omissions, ratifications, and deliberate inaction constituted official policy of the Central Bucks School District for purposes of municipal liability under 42 U.S.C. § 1983.

255. Defendants' failures were not isolated or episodic but occurred repeatedly at multiple decision points before and after receipt of investigative findings, including failures to protect students, failures to disclose abuse, and failures to discipline responsible officials, thereby establishing a persistent and well-settled municipal custom.

256. In subsequent administrative proceedings arising from these same events, CBSD has admitted that its internal investigation confirmed abusive behavior and that state authorities found improper aversive discipline and restraint, further establishing that Defendants' prior denials and inaction were not the product of uncertainty, but of deliberate disregard.

257. In these administrative proceedings, CBSD has admitted:

a. "What constitutes child abuse? The unreasonable restraint of children; serious neglect of children; an imposition of mental anguish on children. That is in our laws. But it's also in a report that was conducted by this district and issued internally on December 12th. There were three validated concerns: restraint of children, keeping these children from water, and mental anguish . . . it was in our own report."
b. That the restraints suffered by J.P. "were illegal."
c. "[W]ithholding water" from J.P. was "an illegal adverse treatment of [J.P.]"
d. J.P. was "abused by [his] teacher and educational assistant."

258. As a result of the above-described abuse and the failures of CBSD that followed, there have been numerous investigations by outside agencies, administrative proceedings, legal

proceedings, and CBSD has made its own post-hoc admissions. Based on all of these it is apparent that:

a. CBSD failed to discipline Defendants McDaniel and Aussprung as well as administrators involved in the failure to report / cover-up of abuse including Defendants Yanni, Garvin, Trawinski, Freiling, Wright, Veisz, and Heineman;
b. CBSD failed to have in place training or other technical assistance to equip its teachers, staff, administrators, and other employees with a full, complete, and legally compliant understanding of restraints and aversive techniques; positive behavior support and appropriate behavioral interventions for students with disabilities; responsibilities under the CPSL, special education laws, and disability rights laws;
c. CBSD failed to have in place a sufficient program of training for teachers, staff, administrators, and other employees regarding restraints and aversive techniques; positive behavior support and appropriate behavioral interventions for students with disabilities; responsibilities under the CPSL, special education laws, and disability rights laws;
d. CBSD failed to have in place sufficient policies governing teachers, staff, administrators, and other employees regarding restraints and aversive techniques; positive behavior support and appropriate behavioral interventions for students with disabilities; responsibilities under the CPSL, special education laws, and disability rights laws.

259. As a result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

## V. CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – Substantive Due Process / Special Relationship Under the Fourteenth Amendment to the United States Constitution

*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

260. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

261. As set forth herein, this is a civil rights action brought pursuant to 42 U.S.C. § 1983 that challenges the constitutionality of the actions by Defendants that resulted in severe injuries to Plaintiff J.P.

262. At all times relevant hereto, Defendants were all "persons" and were acting under "color of state law" pursuant to 42 U.S.C. §1983 by providing care, custody and/or control over Plaintiff J.P. either directly or by delegated authority.

263. At all relevant times, the individual defendants acting under color of state law were employees, agents, were representatives of the Central Bucks School District or affiliated entities.

264. Defendant Yanni is named in this Count in his official and individual capacities.

265. Defendants Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung are named in this Count in their individual capacities.

266. The specific harms to which Defendants exposed Plaintiff J.P. were foreseeable and direct in that Defendants knew that allowing continued child abuse, or inflicting child abuse, within the CBSD would result in severe and lasting harm to Plaintiff J.P.

267. The Fourteenth Amendment to the United States Constitution guarantees the right to substantive due process, including the right to bodily integrity, and freedom from arbitrary and conscious shocking abuse, particularly for vulnerable individuals such as children with disabilities in public schools.

268. At all times material hereto, Defendants were bound by various Pennsylvania statutes as well as, upon information and belief, CBSD's own policies, rules, and regulations.

269. In direct contravention and in violation of those Pennsylvania statutes and upon information and belief, in violation of CBSD's own rules, regulations, and policies, Defendants recklessly and willfully subjected Plaintiff J.P. to physical and psychological harms, described herein, even though such harms were foreseeable.

270. At all times material hereto and upon information and belief, Defendants violated their own rules, regulations, and policies.

271. At all times relevant hereto, a "special relationship" existed between Defendants and Plaintiff J.P.

272. Upon information and belief, a "special relationship" existed between Plaintiff J.P. and the aforesaid Defendants for purposes of 42 U.S.C. § 1983, as Plaintiff J.P. was placed in their care and resulted in the deprivation of Plaintiff J.P.'s safety, liberty, bodily integrity, and subjected J.P. to arbitrary and conscious shocking abuse.

273. Defendants Gabrielle McDaniel and Rachel Aussprung directly violated J.P.'s substantive due process rights by subjecting him to severe and pervasive abuse, including but not limited to:

a. Illegally restraining J.P. countless times over the course of September 2023 through December 20, 2024;
b. Illegally restraining J.P. countless times over the course of September 2023 through December 20, 2024, in violation of 22 Pa. Code § 14.133;
c. Restricting J.P.'s access to water as punishment over the course of September 2023 through December 20, 2024;
d. Restricting J.P.'s access to water as punishment over the course of September 2023 through December 20, 2024, constituting an aversive technique prohibited under 22 Pa. Code § 14.133;
e. Inflicting unwarranted and severe punishment over the course of September 2023 through December 20, 2024, including forcing J.P. to walk barefoot over wood chips, yanking, shoving, pushing, dragging, and/or shaking him, and pulling furniture out from under him causing injuries;
f. Inflicting unwarranted and severe punishment over the course of September 2023 through December 20, 2024, including forcing J.P. to walk barefoot over wood

chips, yanking, shoving, pushing, dragging, and/or shaking him, and pulling furniture out from under him causing injuries, in violation of 22 Pa. Code § 12.5;

g. Allowing and/or encouraging unnecessary periods of nudity and sexual self-stimulation over the course of September 2023 through December 20, 2024, in the classroom, bathroom, and sensory room, including leaving J.P. naked on the bathroom floor on certain occasions for 5 to 40 minutes multiple times a day;

h. Allowing and/or encouraging J.P. to gag himself which would result in him being covered in his own saliva and then failing to or intentionally not helping J.P. to clean the saliva from his body over the course of September 2023 through December 20, 2024;

i. Forcing J.P. over the course of September 2023 through December 20, 2024, to complete schoolwork while nude at his desk and/or workstation including periods of time where he was unlawfully restrained at his desk and/or workstation;

j. Screaming at, mocking, belittling, and ridiculing J.P., including comments about his genitalia and behavior over the course of September 2023 through December 20, 2024;

k. Concealing J.P.'s head injury on February 28th 2024, and failing to seek medical attention, resulting in substantiated child abuse as determined by Bucks County Children and Youth;

l. Such other deliberately indifferent, reckless, and willful and wonton conduct resulting in the violation of Plaintiff's rights that shall be revealed through discovery prior to trial.

274. These actions were conscious-shocking, arbitrary, and egregious, and deprived J.P. of his safety, liberty, and bodily integrity. As a nonverbal child with autism, J.P. was particularly vulnerable and unable to report the abuse.

275. CBSD and the remaining individual Defendants (Yanni, Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, and Moelter) violated J.P.'s substantive due process rights by engaging in a concerted cover up of the abuse, including:

a. Failing to take reasonable and necessary steps to rescue Plaintiff J.P. after placing him in a position of harm;

b. Failing to exercise reasonable and necessary steps to prevent the harms identified above despite knowing that Plaintiff J.P. was in danger;

c. Failing to take reasonable and necessary steps to give aid to Plaintiff or to intervene to prevent further harm;

d. Failing to immediately file ChildLine reports upon receiving allegations of abuse, in violation of 23 Pa.C.S.A § 6311;

e. Filing a false and/or misleading, and/or materially incomplete ChildLine report on November 20th, 2024, that omitted key details of the issues such as restraints, water restriction, corporal punishment, and sexual exploitation and mistreatment;

f. Lying to law enforcement, J.P.'s parents, the Board, and other parents about the abuse, including falsely claiming allegations were "unfounded;"
g. Concealing evidence, including Alyssa Kline's seven-page complaint, the November 16, 2024, e-mail from Christine Trawinski, and CBSD's own December 12, 2024 ,investigative report;
h. Allowing McDaniel and Aussprung to remain in the classroom after reports of child abuse, subjecting J.P. and other nonverbal children to further harm;
i. Directing or encouraging union members not to cooperate with investigations by the federal monitor Disabilities Rights Pennsylvania;
j. Authorizing or approving false communications, such as Defendant Freiling's December 19, 2024, letter and Defendant Yanni's December 20, 2024, e-mail, denying evidence of abuse despite internal findings;
k. Such other deliberately indifferent, reckless, and willful and wonton conduct resulting in the violation of Plaintiff's rights that shall be revealed through discovery prior to trial.

276. Defendants' aforesaid conduct, initiated under color of state law, unlawfully, and/or intentionally, unreasonably, willfully, maliciously, and/or with deliberate and/or reckless indifference violated 42 U.S.C. § 1983 and deprived Plaintiff J.P. of his rights as guaranteed under the Fourteenth Amendment to United States Constitution, similar provisions of the Pennsylvania Constitution, Federal Law, State Law, and/or local law without lawful basis, thus causing injuries and damages to Plaintiff J.P. as aforesaid.

277. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

278. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

279. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT II**
**42 U.S.C. § 1983 – PROCEDURAL DUE PROCESS**
*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

280. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

281. Plaintiff J.P. had a protected interest in his bodily integrity and to be free from arbitrary and conscious shocking abuse, particularly for vulnerable individuals such as children with disabilities in public schools under the Fourteenth Amendment to the United States Constitution. The government may not deprive any person of a protected liberty interest without due process of law.

282. Procedural due process requires that the government provide adequate procedures before depriving an individual of a protected interest. This includes following mandatory investigation and reporting protocols established by state law and agency policy.

283. Under the Pennsylvania Child Protective Services Law, 23 Pa.C.S.A. Chapter 63, CBSD and each of the individual Defendants, all of whom were mandated reporters under Pennsylvania law, were required to report any suspicion of child abuse and neglect, to take appropriate protective action once a report is received, and to follow established protocols to ensure the safety of children in their care.

284. As outlined above, at least as of November 14, 2024, CBSD and the individual Defendants were in receipt of reports of child abuse by Defendants McDaniel and Aussprung.

285. Defendant Yanni is named in this Count in his official and individual capacities.

286. Defendants Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung are named in this Count in their individual capacities.

287. Despite this, Plaintiff J.P. was returned to Room 119 and the care of Defendants McDaniel and Aussprung, Kline was removed from Room 119, CBSD, through Defendant Veisz, actually recommended that J.P. spend *more time* with Defendants McDaniel and Aussprung, and no one filed a ChildLine report as required by law.

288. On November 20, 2024, a ChildLine report was filed though it contained false, misleading, and/or materially incomplete information.

289. Further, upon receipt of Kline's reports of child abuse, CBSD and the individual Defendants failed to implement a safety plan and/or remove Defendants McDaniel and Aussprung from the classroom and/or school as was required by CBSD policy.

290. Further, upon receipt of Kline's reports of child abuse, CBSD and the individual Defendants conducted an utterly flawed and incomplete "investigation" which resulted in no meaningful discipline or corrective action being taken against Defendants McDaniel and Aussprung.

291. CBSD and the individual Defendants failed to follow legally required reporting protocols and mandatory investigative policies.

292. CBSD and the individual Defendants' procedural failures were not isolated oversights. They reflect a systematic and intentional failure to follow the mandatory protocols designed to protect children like Plaintiff J.P. from the precise harm that befell him. These failures were done not in an effort to protect children, but to protect CBSD and the individual Defendants by actively covering up known instances of child abuse occurring in Room 119.

293. Had CBSD and the individual Defendants followed the law and CBSD's mandatory investigation protocols Plaintiff J.P. would have been spared from some, if not all, of the harm that he suffered.

294. As a direct and proximate result of Defendants' failure to provide Plaintiff J.P. with the procedural protections to which he was entitled, Plaintiff J.P. was deprived of his constitutional right to bodily integrity, resulting in injuries to him.

295. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

296. 277. Plaintiffs James Pepper and Lisa Pepper possess a fundamental liberty interest, protected by the substantive component of the Fourteenth Amendment's Due Process Clause, in the care, custody, control, upbringing, protection, and management of their child, Plaintiff J.P., including the freedom to make fundamental decisions concerning his physical safety and welfare without arbitrary governmental interference.

297. 278. Defendants did more than fail to provide notice. By knowingly withholding the true nature of reported abuse, affirmatively substituting the benign explanation of a "personality conflict," providing false assurances, concealing injuries and investigative findings, and representing that no abuse had been found, Defendants manipulated and interfered with

Parents' decision-making process and deprived them of a meaningful opportunity to remove J.P. from danger, obtain timely medical care, and seek protective and legal remedies.

298. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

299. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT III**
**42 U.S.C. § 1983 – Equal Protection Under the Fourteenth Amendment to the United States Constitution**
*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

300. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

301. The Fourteenth Amendment Guarantees equal protection under the law, prohibiting discrimination against individuals with disabilities without rational basis.

302. Defendants discriminated against J.P. based on his disability, nonverbal autism, by subjecting him to abusive treatment not inflicted on nondisabled students, including restraints, water restriction, corporal punishment, and demeaning conduct while relying on his inability to report the abuse.

303. Defendant Yanni is named in this Count in his official and individual capacities.

304. Defendants Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung are named in this Count in their individual capacities.

305. The cover up by the individual defendants further perpetuated this discrimination by denying J.P. equal access to protective mechanisms available to non-disabled students.

306. These actions lacked any rational basis and were motivated by animus towards J.P.'s disability.

307. Defendant Yanni confirmed the discriminatory intent of the acts and omissions described herein.

308. When interviewed by DRP for their investigation, Defendant Yanni was quoted as saying "if these events had occurred in a second-grade class, then yes, the teachers would have been removed." Said differently, Defendant Yanni, the person ultimately responsible for administering policy and keeping children—*all children*—within CBSD safe determined that because Room 119 was just an Autistic Support Classroom, and not a "normal" second-grade classroom, the vulnerable children attending school in Room 119 were less worthy of protection.

309. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

310. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

311. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT IV**
**U.S.C. § 1983 – Municipal Liability Claim**
**Policy, Practice, or Custom**
*Plaintiffs v. Defendants Central Bucks School District and Steven Yanni in his official capacity*

312. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

313. Defendant Central Bucks School District, as a municipal entity, is liable under 42 U.S.C. § 1983 for violations of Plaintiffs' constitutional rights where such violations result from the district's official policy, practice, custom, or deliberate indifference manifested through same that results in constitutional injuries.

314. At all relevant times, Central Bucks School District acted through its Superintendent, Defendant Yanni, who—by Board-approved contract—was vested with final authority over school administration, including personnel supervision, student-safety, special-education practices, and complaint handling. The contract required that complaints be routed to him, prohibited policies limiting his authority, ensured he received Board communications, insulated him from discipline, and indemnified him for acts within his duties. Despite notice of serious risks to students, District policymakers, including Defendant Yanni, established an official policy, practice, or custom of failing to investigate allegations of abuse, failing to properly report allegations of abuse to avoid scrutiny, and failing to intervene in known abuses.

315. Defendant CBSD, by and through its final policymakers, had in force and effect during the time of the abuse that occurred to Plaintiff J.P., and for many years preceding these abuses coming publicly to light, a policy, practice or custom of unconstitutional misconduct in the care, custody, supervision and/or control of minor students that were placed in its care. Such unconstitutional misconduct includes the acts and abuses that are described in the preceding paragraphs of this Complaint and the official policy, practice, and/or custom of failing to investigate allegations of abuse, failing to properly report allegations of abuse to avoid scrutiny, and failing to intervene in known abuses.

316. Defendant CBSD, had actual or constructive notice of these policies, practices, and/or customs, but repeatedly failed to make any meaningful investigation into the complaints that were raised and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

317. Such unconstitutional municipal customs, practices, and/or policies were the moving force behind the abuse that occurred to Plaintiff J.P. and the injuries and damages he sustained as a result.

318. Defendant Yanni's primary goal as Superintendent, to which he has testified under oath, was "to keep [CBSD] out of the newspaper." Yanni accomplished this goal, in part, by encouraging and allowing a policy, practice, and/or custom that saw subordinate administrators require teachers and other staff to ignore their legally mandated responsibilities to report suspicions of child abuse.

319. Evidence of this policy, practice, and/or custom is best encapsulated by the November 2, 2023, email sent by Defendant Heineman to all staff at Jamison Elementary which included the directive that all ChildLine reports had to come through him for "final approval" and to "speak with (him) prior to reporting."

320. CBSD's policy of requiring mandated reporters to seek approval for the filing of ChildLine reports, CBSD's conduct in conspiring to and, at least for a time, successfully covering up J.P.'s abuse, CBSD's willfully false ChildLine report of November 20, 2024, Defendant Yanni's refusal to cooperate with law enforcement by timely providing information regarding its investigation, and CBSD's refusal to truthfully describe the allegations made by Kline to Parents support Yanni's stated goal of keeping CBSD "out of the newspaper" and the fulfillment of the policy, practice, and/or custom that he encouraged and allowed.

321. This is further evidenced by the "culture of distrust and fear of retaliation" that DRP found "undoubtedly contributed to the lack of appropriate reporting and response by the District."

322. Defendants CBSD acted in a willful disregard for the safety of Plaintiff J.P. and a reckless or callous indifference for his protected rights.

323. Defendant CBSD's acts and omissions, as described in the preceding paragraphs of this Complaint, were the direct and proximate cause of Plaintiff J.P.'s damages and injuries.

324. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

325. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

326. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT V**
**U.S.C. § 1983 – Municipal Liability Claim**
**Failure to Train, Supervise, and Discipline**
*Plaintiffs v. Defendants Central Bucks School District and Steven Yanni in his official capacity*

327. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

328. Defendant Central Bucks School District, as a municipal entity, is liable under 42 U.S.C. § 1983 for violations of Plaintiff J.P.'s constitutional rights where such violations result from the district's official policy, practice, custom, or deliberate indifference manifested through same that results in constitutional injuries.

329. At all relevant times, Central Bucks School District acted through its Superintendent, Defendant Yanni, who—by Board-approved contract—was vested with final authority over school administration, including personnel supervision, student-safety, special-education practices, and complaint handling. The contract required that complaints be routed to him, prohibited policies limiting his authority, ensured he received Board communications, insulated him from discipline, and indemnified him for acts within his duties. Despite notice of serious risks to students, District policymakers, including Defendant Yanni, established an official policy, practice, or custom of failing to investigate allegations of abuse, failing to properly report allegations of abuse to avoid scrutiny, and failing to intervene in known abuses.

330. Defendant CBSD, by and through its final policymakers, had in force and effect during the time of the abuse that occurred to Plaintiff J.P., and for many years preceding these abuses coming publicly to light, a policy, practice or custom of unconstitutional misconduct in the care, custody, supervision and/or control of minor students that were placed in its care. Such unconstitutional misconduct includes the acts and abuses that are described in the preceding paragraphs of this Complaint and the official policy, practice, and/or custom of failing to properly train, supervise, and discipline teachers and staff within its control.

331. The Central Bucks School district failed to adequately train, supervise, and/or discipline its employees, including but not limited to teachers, aids, administrators, human

resources personnel, and principles, in areas critical to protecting the rights of students with disabilities, such as:

a. Recognizing, preventing, and properly responding to child abuse, including physical, emotional, and sexual abuse, as defined under 23 Pa. C.S.A. § 6303 and 23 Pa. C.S.A. § 6311;
b. The appropriate use of restraints, positive behavioral support plans, and prohibitions on aversive techniques, corporal punishment, and seclusion under 22 Pa. Code § § 12.5, 14.133, and Section 504 of the Rehabilitation Act;
c. Handling disability related behaviors in students with autism, including nonverbal communication, sensory issues, and self-stimulation, without resorting to discriminatory or punitive measures;
d. Conducting investigations into allegations of abuse, including preserving evidence such as videotapes, avoiding conflicts of interest (e.g., favoritism between principals and teachers), and ensuring compliance with reporting obligations to ChildLine, police, and parents;
e. Preventing and addressing cover ups, conflicts of interest, and retaliation against whistleblowers.

332. The failure to train, supervise, and/or discipline amounted to deliberate indifference to the constitutional rights of Plaintiff J.P., as evidenced by:

a. CBSD's failure to properly, completely, and timely report the allegations of abuse at issue in this case as required by law;
b. CBSD's assignment of Robert Freiling, an individual with no training in child abuse identification or child abuse reporting, to lead the investigation into Alyssa Kline's allegations, resulting in a flawed "investigation" that prioritized concealment over child safety;
c. Allowing Defendants McDaniel and Aussprung to continue teaching four nonverbal children with autism even after the allegations of abuse were reported and corroborated;
d. Allowing Defendant Heineman to direct in his November 2, 2023, email that all ChildLine reports must receive his "final approval," which discouraged reporting and protected abusive staff, particularly given his inappropriate relationship with Defendant McDaniel;
e. The systemic pattern of abuse and cover up, including the failure to report or act on corroborated allegations from multiple sources allowing Plaintiff J.P. to continue to endure abuse even after Kline's reports;
f. Allowing Plaintiff J.P. to be subjected to thousands of illegal restraints, water restriction, corporal punishment, nudity, inappropriate self-stimulation, physical, mental and emotional abuse, and mockery from September 2023 through December 2024;
g. Allowing the withholding of information from parents, law enforcement, ChildLine, the Pennsylvania Department of Education, and DRP, including

concealing key documents like the November 16, 2024, e-mail from Christine Trawinski, and failing to preserve videotape evidence despite notice;

h. Failing to remove, discipline, or attempt to remediate the misconduct of Defendants Yanni, Garvin, Heineman, Wright, Freiling, Veisz, McDaniel, and Aussprung even after such misconduct was well known to CBSD;

i. CBSD's insistence, even after all facts were known to CBSD, to report to the community, law enforcement, and other government agencies that the allegations of abuse at issue in this case were "unfounded" or otherwise not true.

333. CBSD's deliberate indifference was the moving force behind the constitutional violations suffered by Plaintiff J.P., including deprivations of his substantive due process rights to bodily integrity as well as equal protection under the law.

334. Had the district provided adequate training on the supervision or discipline the abuse, cover up, and resulting harm to Plaintiff J.P. would have been prevented.

335. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

336. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

337. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT VI**
**42 U.S.C. § 1983 – Failure to Intervene**

*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

338. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

339. Defendants were present during, aware of, or informed of ongoing abuse and constitutional violations committed against Plaintiff J.P. and had a realistic and reasonable opportunities and responsibilities to intervene to stop and/or to prevent the abuse from occurring and/or continuing to occur and to prevent the violation of Plaintiff J.P.'s clearly established constitutional rights. Defendants nevertheless failed to take any action to stop the abuse, report it, or protect Plaintiff J.P. from ongoing harms, injuries, and constitutional violations.

340. Defendant Yanni is named in this Count in his official and individual capacities.

341. Defendants Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung are named in this Count in their individual capacities.

342. Defendants' failure to intervene occurred despite their authority and legal obligation to act and constituted deliberate indifference to Plaintiff J.P.'s rights under the Fourteenth Amendment.

343. Defendants' failures to intervene violated Plaintiff J.P.'s clearly established constitutional rights under the Fourteenth Amendment of the United States Constitution.

344. The failures of Defendants were made in a willful disregard for the safety of Plaintiff J.P. and a reckless or callous indifference for his protected rights.

345. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress,

embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

346. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

347. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT VII**
**42 U.S.C. § 1983 – State Created Danger**
*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

348. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

349. At all times material hereto, CBSD and the individual CBSD employee Defendants acted under color of state law in their capacities as employees and agents of a CBSD bound, as previously set forth herein, by the Fourteenth Amendment to the United States Constitution, laws and regulations of the Commonwealth of Pennsylvania, as well, upon information and belief, their own policies, rules, and regulations for the management, care, and oversight of children in their care.

350. Defendant Yanni is named in this Count in his official and individual capacities.

351. Defendants Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung are named in this Count in their individual capacities.

352. In direct contravention and violation of the above Defendants recklessly, willfully, and with deliberate indifference, physically, verbally, and psychologically abused Plaintiff J.P. and/or knowingly allowed same.

353. Defendants, without lawful basis, caused the aforementioned injuries and damages to Plaintiff J.P. by creating the danger to which Plaintiff J.P. was exposed, in violation of his aforesaid guaranteed rights, as set forth in the preceding paragraphs of this Complaint.

354. The danger created by Defendants, as set forth above, was foreseeable and direct.

355. Through their failures, affirmative acts, and omissions as set forth above, Defendants created a degree of culpability that shocks the conscience.

356. Defendants, through the staff, employees, and/or agents of CBSD, affirmatively used state authority to deprive Plaintiff J.P. of his aforesaid guaranteed rights, as set forth in the preceding paragraphs of this Complaint, including, but not limited by, the establishment of a policy, practice, and/or custom to ensure legally mandated child abuse reports were not made, submitting knowingly false and/or misleading and/or incomplete reports of abuse, knowingly submitting false and/or misleading and/or incomplete information regarding the abuse to law enforcement, and/or placing Plaintiff J.P. and other vulnerable students in Room 119 even after reports of abuse were submitted to CBSD and/or its administrators.

357. The failures, affirmative acts, and omissions as set forth above were not split-second decisions or momentary lapses but deliberate actions taken to fulfill the goal of keeping CBSD "out of the newspaper" and covering up from the public allegations of abuse at CBSD.

358. In creating the danger as set forth above, Defendants acted in a willful disregard for the safety of Plaintiff J.P. and a reckless and/or callous indifference for his protected rights.

359. As the facts set forth in this Complaint demonstrate, Defendants knew or should have known that CBSD staff, employees, and/or agents were abusing Plaintiff J.P., and that by failing to take action to stop such abuses, Plaintiff J.P. was exposed to serious harm and established a deliberate indifference on their behalf towards him.

360. Defendants Yanni, Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung are all personally liable for their role(s) in abusing Plaintiff J.P. and/or failing to report or investigate the abuse and/or allowing the abuse to continue even after Kline's report and/or affirmatively covering up the reports of and actual abuse of Plaintiff J.P.

361. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

362. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

363. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT VIII**
**42 U.S.C. § 1983 – Civil Rights Conspiracy**
*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

364. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

365. The Individual Defendants conspired among themselves and with other individuals to act in concert under color of law and within the scope of their employment or agency to deprive Plaintiff J.P. of his constitutional rights, including under the 14th Amendment of the United States Constitution, as detailed throughout this Complaint.

366. Defendant Yanni is named in this Count in his official and individual capacities.

367. Defendants Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung are named in this Count in their individual capacities.

368. Defendants conspired by concerted action to accomplish an unlawful purpose (violating Plaintiff J.P.'s constitutional rights) through unlawful means (e.g., violating mandatory reporting laws under 23 P.S. § 6311, fabricating reports, and suppressing evidence). In furtherance of the conspiracy, they committed numerous overt acts, including but not limited to:

a. Failing to immediately file ChildLine reports upon receiving allegations of abuse;
b. Failing a false and/or misleading and/or incomplete ChildLine report that deliberately omitted corroborated and material details of restraints, water restriction, corporal punishment, nudity, sexual self-stimulation, mocking, yelling, and child abuse;
c. Falsely claiming to law enforcement, Parents, the CBSD Board, and the community at large, that the allegations were "unfounded" and that there was "no evidence of abuse;"
d. Concealing evidence, such as Alyssa Kline's seven-page complaint, the November 16, 2024, Trawinski e-mail, CBSD's December 12, 2024, investigative memorandum, and failing to preserve or review videotape evidence despite notice;
e. Allowing McDaniel and Aussprung to remain in the classroom thereby exposing Plaintiff J.P. and other vulnerable children to further harm;
f. Directing or encouraging union members (through Alderfer) not to cooperate with the DRP investigation;
g. Approving and disseminating false communications denying abuse.

369. Each individual Defendant was a willful participant in this joint activity, acting with deliberate indifference, malice, and reckless disregard for Plaintiff J.P.'s clearly established

constitutional rights. The conspiracy was motivated, in part, by animus towards Plaintiff J.P.'s disability and retaliation against Parents for their advocacy on behalf of students with disabilities.

370. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

371. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

372. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT IX**
**42 Pa.C.S.A. § 8550 – Willful Misconduct**
*Plaintiffs v. Defendants Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

373. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

374. Under 42 Pa.C.S.A. § 8550, governmental immunity does not apply when it is judicially determined that a local agency employee's act constituted a crime, actual fraud, actual malice, or willful misconduct.

375. Defendant CBSD, a municipal entity acts only through its agents, employees, and/or staff, and the said agents, employees, and/or staff named as Defendants in this Complaint

engaged in crimes, actual fraud, actual malice, and/or willful misconduct, including, but not limited by, the establishment of a policy, practice, and/or custom to ensure legally mandated child abuse reports were not made, submitting knowingly false and/or misleading and/or incomplete reports of abuse, knowingly submitting false and/or misleading and/or incomplete information regarding the abuse to law enforcement, and/or placing Plaintiff J.P. and other vulnerable students in Room 119 even after reports of abuse were submitted to CBSD and/or its administrators.

376. Defendants Yanni, Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung as a result of their role(s) in abusing Plaintiff J.P. and/or deliberately failing to report or investigate the abuse and/or intentionally allowing the abuse to continue even after Kline's report and/or affirmatively covering up the reports of and actual abuse of Plaintiff J.P. each engaged in a crime, and/or actual fraud, and/or actual malice, and/or willful misconduct.

377. The conduct of each of the Defendants constitutes willful misconduct, a conscious, voluntary act or omission in reckless disregard of a legal duty and the consequences to Plaintiff J.P. Each Defendant had actual knowledge of the substantial risk of serious harm to Plaintiff J.P., actually drew the inference that Plaintiff J.P. was in danger, and consciously chose to disregard that risk.

378. In fact, through various administrative and legal proceedings, CBSD has specifically alleged and admitted that the conduct of Defendants Yanni, Heineman, Wright, McDaniel, and Aussprung was willful in nature as a basis for their respective (albeit belated) terminations. Those allegations and admissions by CBSD have been upheld in those administrative and legal proceedings.

379. Because the individual Defendants' conduct constitutes willful misconduct, the protections of governmental immunity under 42 Pa.C.S.A. §§ 8541, 8545, 8546, 8548, and 8549 do not apply.

380. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

381. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

382. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT X**
**Negligence and Gross Negligence**
*Plaintiffs v. Defendants Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

383. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

384. Defendant CBSD, a municipal entity acts only through its agents, employees, and/or staff, and the said agents, employees, and/or staff named as Defendants in this Complaint engaged in negligent acts, including, but not limited by, the establishment of a policy, practice, and/or custom to ensure legally mandated child abuse reports were not made, submitting

knowingly false and/or misleading and/or incomplete reports of abuse, knowingly submitting false and/or misleading and/or incomplete information regarding the abuse to law enforcement, and/or placing Plaintiff J.P. and other vulnerable students in Room 119 even after reports of abuse were submitted to CBSD and/or its administrators.

385. Defendants Yanni, Garvin, Wright, Heineman, Freiling, Veisz, Trawinski, Alderfer, Moelter, McDaniel, and Aussprung as a result of their role(s) in abusing Plaintiff J.P. and/or deliberately failing to report or investigate the abuse and/or intentionally allowing the abuse to continue even after Kline's report and/or affirmatively covering up the reports of and actual abuse of Plaintiff J.P. each engaged in negligent acts.

386. CBSD and the individual Defendants each owed a duty to Plaintiff J.P. to keep him safe and free from harm from known or reasonably knowable dangers. Defendants failed to do so and breached the duties owed to Plaintiff J.P. by:

a. Allowing Plaintiff J.P. to be illegally restrained countless times over the course of September 2023 through December 20, 2024, and/or engaging in the conduct directly;
b. Allowing Plaintiff J.P. to be illegally restrained countless times over the course of September 2023 through December 20, 2024, in violation of 22 Pa. Code § 14.133 and/or engaging in the conduct directly;
c. Allowing Plaintiff J.P. to be illegally restricted from access to water as punishment over the course of September 2023 through December 20, 2024, and/or engaging in the conduct directly;
d. Allowing Plaintiff J.P. to be illegally restricted from access to water as punishment over the course of September 2023 through December 20, 2024, constituting an aversive technique prohibited under 22 Pa. Code § 14.133 and/or engaging in the conduct directly;
e. Allowing the infliction of unwarranted and severe punishment over the course of September 2023 through December 20, 2024, including forcing Plaintiff J.P. to walk barefoot over wood chips, yanking, shoving, pushing, dragging, and/or shaking him, and pulling furniture out from under him causing injuries and/or engaging in the conduct directly;
f. Allowing the infliction of unwarranted and severe punishment over the course of September 2023 through December 20, 2024, including forcing Plaintiff J.P. to walk barefoot over wood chips, yanking, shoving, pushing, dragging, and/or

shaking him, and pulling furniture out from under him causing injuries, in violation of 22 Pa. Code § 12.5 and/or engaging in the conduct directly;

g. Allowing and/or encouraging unnecessary periods of nudity and sexual self-stimulation over the course of September 2023 through December 20, 2024, in the classroom, bathroom, and sensory room, including leaving Plaintiff J.P. naked on the bathroom floor on certain occasions for 5 to 40 minutes multiple times a day and/or engaging in the conduct directly;
h. Allowing and/or encouraging Plaintiff J.P. to gag himself which would result in him being covered in his own saliva and then failing to or intentionally not helping Plaintiff J.P. to clean the saliva from his body over the course of September 2023 through December 20, 2024, and/or engaging in the conduct directly;
i. Allowing Plaintiff J.P. to be forced over the course of September 2023 through December 20, 2024, to complete schoolwork while nude at his desk and/or workstation including periods of time where he was unlawfully restrained at his desk and/or workstation and/or engaging in the conduct directly;
j. Allowing Plaintiff J.P. to be screamed at, mocked, belittled, and ridiculed, including comments about his genitalia and behavior over the course of September 2023 through December 20, 2024 and/or engaging in the conduct directly;
k. Allowing the concealment of Plaintiff J.P.'s head injury on February 28th 2024, and failing to seek medical attention, resulting in substantiated child abuse as determined by Bucks County Children and Youth and/or causing such injuries;
l. Failing to take reasonable and necessary steps to rescue Plaintiff J.P. after placing him in a position of harm;
m. Failing to exercise reasonable and necessary steps to prevent the harms identified above despite knowing that Plaintiff J.P. was in danger;
n. Failing to take reasonable and necessary steps to give aid to Plaintiff or to intervene to prevent further harm;
o. Failing to immediately file ChildLine reports upon receiving allegations of abuse, in violation of 23 Pa. C.S.A. § 6311;
p. Filing a false and/or misleading, and/or materially incomplete ChildLine report on November 20th, 2024, that omitted key details of the issues such as restraints, water restriction, corporal punishment, and sexual exploitation and mistreatment;
q. Lying to law enforcement, J.P.'s parents, the Board, and other parents about the abuse, including falsely claiming allegations were "unfounded;"
r. Concealing evidence, including Alyssa Kline's seven-page complaint, the November 16, 2024, e-mail from Christine Trawinski, and CBSD's own December 12, 2024, investigative report;
s. Allowing Defendants McDaniel and Aussprung to remain in the classroom after reports of child abuse, subjecting J.P. and other nonverbal children to further harm;
t. Directing or encouraging union members not to cooperate with investigations by the federal monitor Disabilities Rights Pennsylvania;
u. Authorizing or approving false communications, such as Defendant Freiling's December 19, 2024, letter and Defendant Yanni's December 20, 2024, e-mail, denying evidence of abuse despite internal findings;
v. permitting Defendants McDaniel and Aussprung to abuse Plaintiff J.P.;

w. failing to properly and adequately screen, supervise, train, and/or discipline its employees to prevent the abuse of Plaintiff J.P.;
x. failing to adopt, enforce and/or follow adequate policies and procedures for the protection and reasonable supervision of children who attend CBSD schools, including Plaintiff J.P., or, in the alternative, failing to implement and comply with such procedures which had been adopted;
y. failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of students at CBSD schools, including Plaintiff J.P.;
z. creating an environment that facilitated abuse by employees including Defendants McDaniel and Aussprung;
aa. failing to adopt, enforce and/or follow policies and procedures to protect student like Plaintiff J.P. against harmful influence and contact by its teachers, including Defendants McDaniel and Aussprung;
bb. violation of duties imposed by Restatement (Second) of Torts, §§ 302B, 314, 315, 317, 323, 324A, 343, 344 and 371 and Restatement (Second) of Agency § 213 and 219 as adopted in Pennsylvania;
cc. failing to warn Parents of the risk of harm posed by Defendants McDaniel and Aussprung after Defendants knew or should have known of such risk;
dd. failing to provide Plaintiff J.P. with any assistance in coping with the injuries sustained;
ee. ratifying the conduct of the individual Defendants named herein;
ff. failing to warn or otherwise make reasonably safe the property which Defendant possessed and/or controlled, leading to the harm of Plaintiff J.P.;
gg. failing to adopt/implement and/or enforce policies and procedures for the reporting to law enforcement, Office of Children and Youth, the Pennsylvania Department of Education, authorities within Defendant's school, and/or other authorities of harmful acts to children including Plaintiff J.P.;
hh. failing to report Defendant McDaniel's or Defendant Aussprung's harmful acts to authorities within Defendant's school and/or other legal authorities;
ii. violating the requirements of Pennsylvania's Child Protective Services Law, 23 § 6311(a) and (b), and/or the Educator Discipline Act, 24 P.S. §§ 2070.1 *et seq.* constituting negligence *per se*;
jj. ignoring, concealing, or otherwise mitigating the seriousness of the known danger that Defendants McDaniel and Aussprung posed;
kk. failing to prevent the abuse that was committed by Defendants McDaniel and Aussprung on Plaintiff J.P.;
ll. allowing Defendants McDaniel and Aussprung to remain on school staff and in control of Room 119 after knowing that they abused Plaintiff J.P.;
mm. failing to properly supervise and/or discipline its employees;
nn. failing to adequately and properly train its employees regarding the abuse of students by teachers and/or employees and the red flags and/or warning signs of abuse; and
oo. negligently managing and/or operating CBSD;
pp. Such other acts and/or omissions that shall be revealed through discovery prior to trial.

387. The individual Defendants' conduct further constitutes willful misconduct within the meaning of 42 Pa.C.S.A. § 8550, as each Defendant acted with conscious disregard of a known risk of serious harm to Plaintiff J.P. Accordingly, the protections of governmental immunity under 42 Pa.C.S.A. §§ 8541, 8545, 8546, 8548, and 8549 do not apply.

388. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

389. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

390. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

## COUNT XI
## Negligence *Per Se*

*Plaintiffs v. Defendants Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

391. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

392. Defendants knew, had knowledge, or had reasonable suspicion of harmful acts being committed by its staff against Plaintiff J.P. and negligently, recklessly and/or intentionally

violated their statutory duty to report such abuse as required by Pennsylvania's Child Protective Services Law (PCPSL), 23 § 6311.

393. Defendants' violations constitute negligence *per se* under Pennsylvania law.

394. Defendants' negligent, reckless and/or intentional failure to report such harmful acts allowed CBSD staff to abuse Plaintiff J.P., causing continuing harm to Plaintiff J.P. and the injuries and damages described herein.

395. Such failure on the part of Defendants was reckless, intentional, knowing, grossly negligent, deliberately and recklessly indifferent, outrageous, malicious and/or was a reckless and conscious disregard for the safety of Plaintiff J.P.

396. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

397. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

398. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

## COUNT XII
## Intentional Infliction of Emotional Distress

*Plaintiffs v. Defendants Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

399. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

400. Defendants, by and through their contact and acts with Plaintiff J.P., as described above, intentionally committed multiple acts of extreme and outrageous conduct which caused severe emotional, psychological, and psychiatric injuries, distress, and harm to Plaintiffs, which also manifested in physical injuries to Plaintiff J.P. as set forth above, in an extreme, outrageous and harmful manner.

401. Defendants extreme and outrageous conduct, including the cover up of the abuse, was reckless, intentional, knowing, grossly negligent, deliberately and recklessly indifferent, outrageous, malicious and/or was a reckless and conscious disregard for the safety of Plaintiff J.P. and caused severe emotional distress to Plaintiff J.P. and to Parents.

402. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

403. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

404. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT XIII**
**Negligent Infliction of Emotional Distress**
*Plaintiffs v. Defendants Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

405. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

406. Defendants, by and through their contact and acts with Plaintiff J.P., as described above, negligently and/or recklessly committed multiple acts of extreme and outrageous conduct which caused severe emotional, psychological, and psychiatric injuries, distress, and harm to Plaintiffs, which also manifested in physical injuries to Plaintiff J.P. as set forth above, in an extreme, outrageous and harmful manner.

407. Defendants extreme and outrageous conduct, including the cover up of the abuse, was negligent and/or reckless and caused severe emotional distress to Plaintiff J.P. and to Parents.

408. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

409. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

410. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT XIV**
**Assault and Battery**
*Plaintiffs v. Defendants Gabrielle McDaniel, and Rachel Aussprung*

411. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

412. Defendants McDaniel and Aussprung intentionally caused harmful or offensive contact with J.P. through restraints, manhandling, corporal punishment and forced exposure, constituting assault and battery.

413. Defendants McDaniel and Aussprung subjected Plaintiff J.P. to unwanted contact, as described above.

414. The contact was meant or expected to place Plaintiff J.P. in reasonable and immediate apprehension of imminent harmful or offensive contact.

415. The contact did in fact place Plaintiff J.P. in immediate apprehension of harmful or offensive contact.

416. The harmful contact was meant to cause harmful and offensive contact with the Plaintiff J.P.'s body.

417. Defendants McDaniel and Aussprung at all relevant times were acting in the scope of their employment, and/or in the course of actual or apparent agency, including under Restatement (Second) or Agency § 219 and/or as an agent, servant, or employee of Defendant CBSD.

418. Defendants McDaniel and Aussprung engaged in unpermitted, harmful and offensive contact upon the person of Plaintiff J.P. in violation of Pennsylvania State Law. Said conduct was undertaken while Defendants McDaniel and Aussprung were employees and agents of Defendant CBSD, while in the course and scope of their employment with Defendant CBSD, and/or was ratified by Defendant CBSD.

419. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

420. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

421. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

## COUNT XV
## Violation of the Pennsylvania Human Relations Act 43 P.S. § 951 – (Disability Discrimination)

*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

422. Plaintiffs incorporate by reference to all preceding paragraphs as if fully set forth herein.

423. The Pennsylvania Human Relations Act ("PHRA") prohibits disability-based discrimination in public accommodations, including schools. Defendants discriminated against Plaintiff J.P. through the abusive practices and cover up described herein, including aversive discipline, restraints, nakedness, exposure, seclusion, denial of order, intentional infliction of pain, refusal of accommodations, refusal to implement IEP/BPSP, and the creation of a hostile environment, all on the basis of his disability.

424. As a direct and proximate result of the abuse described above, Plaintiff J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

425. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

426. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT XVI**

**Violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 – Sex Discrimination**

*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

427. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

428. The PHRA prohibits sex-based discrimination in public accommodations, including schools. Defendants discriminated against Plaintiff J.P. on the basis of sex through sexual abuse, harassment, and humiliation, including but not limited to:

a. Forcing Plaintiff J.P. to remain unclothed and exposed while engaging in self-stimulation;
b. Mocking and ridiculing Plaintiff J.P.'s genitalia and sexual behaviors (which Defendants themselves encouraged and allowed);
c. Allowing prolonged nudity in the classroom, sensory room, and bathroom as punishment;
d. Failing to intervene or reclothe Plaintiff J.P. and exploiting his vulnerability as a minor incapable of consent.

429. These actions were severe, pervasive, and created a hostile environment based on sex, denying Plaintiff J.P. equal educational opportunities.

430. As a direct and proximate result of the abuse described above, Plaintiff J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

431. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

432. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT XVII**
**Violation of the Pennsylvania Human Relations Act, 43 P.S. § 951 – Retaliation**
*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

433. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

434. The PHRA prohibits retaliation against individuals who oppose discriminatory practices or advocate on behalf of protected individuals.

435. Parents James Pepper and Lisa Pepper engaged in protected activity by advocating for Plaintiff J.P. and J.P.2, including successfully pursuing a private placement under the IDEA for J.P.2 sibling and speaking out as a school board member on district matters.

436. Defendants retaliated by:

a. Subjecting Plaintiff J.P. to heightened abuse and harassment due to resentment of the Parents and Parents' advocacy;
b. Concealing details of the abuse from Parents to prevent further advocacy or legal action;
c. Engaging in a cover up, including false reports to authorities and withholding information, motivated in part by Parents' history of successful advocacy.

437. These retaliatory actions were causally connected to the Parents' protected activities and created a hostile environment for Plaintiff J.P.

438. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

439. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

440. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT XVIII**
**Violation of the Pennsylvania Fair Educational Opportunities Act, 24 P.S. § 5001**
*Plaintiffs v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

441. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

442. The Pennsylvania Fair Educational Opportunities Act ("PFEOA") prohibits unfair educational practices in educational institutions, including discrimination on the basis of disability or sex, and retaliation against those who oppose such practices.

443. Defendants violated the PFEOA by denying Plaintiff J.P. equal educational opportunities through:

a. Disability based discrimination, including aversive punishments, restraints, denial of accommodations, failure to implement IEP/PBSP, and creation of a hostile environment;
b. sex based discrimination including sexual harassment, exposure, and humiliation as detailed above;
c. retaliation against Parents for their advocacy on behalf of students with disabilities, including the cover up to prevent remedial action.

444. These actions constituted unfair educational practices under 24 P.S. § 5004, denying Plaintiff J.P. the full benefits of public education and retaliation in violation of 24 P.S. § 5009.

445. As a direct and proximate result of the abuse described above, J.P. has been diagnosed with Post-Traumatic Stress Disorder, has suffered and will continue to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was

prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

446. Plaintiffs James Pepper and Lisa Pepper suffered emotional distress and loss of educational opportunities for their son.

447. Plaintiffs seek compensatory damages, punitive damages, attorneys' fees, costs, and such other relief as the court deems appropriate.

**COUNT XIX**

**42 U.S.C. § 1983 – First Amendment Retaliation (Free Speech and Petition Clauses)**

*Plaintiffs James and Lisa Pepper v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

448. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

449. The First Amendment protects the rights to speak on matters of public concern and to petition government for redress of grievances. A First Amendment retaliation claim requires protected activity, retaliatory action sufficient to deter a person of ordinary firmness, and a causal connection between the two. At all relevant times, Defendants acted under color of state law.

450. James Pepper engaged in protected First Amendment activity as a parent and private citizen by, among other things, advocating for students with disabilities; petitioning governmental actors concerning educator misconduct; filing an educator-misconduct complaint with the Pennsylvania Department of Education; bringing federal litigation to vindicate his First Amendment right to discuss that complaint; publicly criticizing governmental responses to educator misconduct; and pursuing or supporting legal and administrative remedies concerning his children's education. His public speech concerning District governance and other matters of public

concern provides additional context for Defendants' knowledge of his willingness to speak publicly.

451. James and Lisa Pepper also engaged in protected petitioning and advocacy on behalf of their children, including invoking IDEA due-process procedures concerning J.P. 2 and advocating for appropriate educational services and protections for their children. The Third Circuit has treated parents' efforts to enforce their child's rights to a free appropriate public education as protected activity for purposes of a First Amendment retaliation claim.

452. Defendants knew of Parents' history of advocacy and litigation. Among other facts demonstrating such knowledge, Defendants McDaniel and Aussprung warned Kline about Parents and specifically stated that Parents had previously "sued the School District," and McDaniel expressed suspicion that Parents had placed a listening device on J.P.'s communication device so they could monitor Room 119 and bring litigation against CBSD. James Pepper's advocacy and public role were also known to District administrators with whom he served and interacted as an elected Board member.

453. Given this history, Defendants knew that truthful disclosure of allegations that District personnel were abusing J.P. would foreseeably cause Parents to engage in additional protected speech, petitioning, requests for outside investigation, legal action, and public criticism. The subject matter was not remote from Parents' prior protected activity: it again involved the treatment of a profoundly disabled child by public-school personnel and alleged educator misconduct.

454. Motivated at least in substantial part by hostility toward, fear of, or a desire to avoid and deter further protected activity by Parents, Defendants subjected Parents to retaliatory governmental action. Before Parents removed J.P. on December 18, 2024, Defendants concealed

the abuse allegations, falsely described the matter as a "personality conflict," affirmatively reassured James Pepper that there was nothing to be concerned about, withheld corroborated information concerning abuse, and left the accused employees in control of J.P. while Parents were kept uninformed and misled. After Parents removed J.P., Defendants continued the same retaliatory course by issuing and approving the December 19, 2024, communication that falsely claims there was "no evidence of abuse" concerning what had happened to J.P.

455. These were affirmative exercises of governmental authority affecting the safety, education, and care of Parents' profoundly disabled, nonverbal child. The conduct was more than de minimis and was objectively sufficient to deter a person of ordinary firmness from exercising First Amendment rights. Parents' persistence after learning the truth does not defeat this objective element.

456. The causal connection is supported by the record as a whole, including Defendants' knowledge of Parents' prior advocacy and litigation; the express discussion within Room 119 of Parents' prior suit and the expressed fear that Parents were monitoring the classroom to bring litigation; the close subject-matter relationship between Parents' protected activity and the educator/special-education misconduct concealed here; the deliberate substitution of a benign "personality conflict" narrative for known and corroborated abuse allegations; the concealment of information Defendants understood would trigger additional advocacy; and Defendant Yanni's stated objective of keeping CBSD "out of the newspaper."

457. Plaintiffs allege that retaliatory animus was a but-for cause of the adverse treatment: absent Parents' protected advocacy, petitioning, litigation, and public criticism, Defendants would not have deliberately concealed and materially mischaracterized the allegations concerning J.P. in the manner alleged. Alternatively, Parents' protected activity was a substantial or motivating

factor, and Defendants cannot establish that they would have taken the same actions for legitimate reasons independent of retaliatory animus.

458. CBSD is liable under *Monell* because the retaliatory conduct was undertaken pursuant to the policies, customs, practices, final-policymaker decisions, delegated authority, and/or ratification alleged above, including the District's practices of suppressing abuse reports, controlling disclosure, and concealing allegations in order to avoid scrutiny and publicity. In particular, Plaintiffs allege that Yanni personally participated in and directed material aspects of the concealment and false communications while exercising the final or delegated operational authority described above, and that the Board thereafter knowingly ratified or failed to correct the course of conduct after receiving notice of the underlying facts.

459. As a direct and proximate result, James and Lisa Pepper suffered loss of the ability to make timely protective decisions for J.P., emotional distress, loss of trust in the public institutions charged with his care, economic and out-of-pocket losses associated with responding to the concealed abuse, and other compensable injuries personal to them. J.P.'s separate injuries caused by his continued exposure are pleaded and sought in the counts asserting his own constitutional and statutory rights.

460. Plaintiffs seek compensatory damages, punitive damages against the individual Defendants where permitted, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems appropriate.

**COUNT XX**
**42 U.S.C. § 1983 – Fourteenth Amendment Substantive Due Process: Right to Familial Integrity and Parental Decision-Making**
*Plaintiffs James and Lisa Pepper v. Defendants Central Bucks School District, Steven Yanni, Nadine Garvin, Alyssa Wright, David Heineman, Robert Freiling, Kathleen Veisz, Christine Trawinski, Cara Alderfer, Kathy Moelter, Gabrielle McDaniel, and Rachel Aussprung*

461. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

462. The substantive component of the Fourteenth Amendment's Due Process Clause protects the fundamental liberty interest of parents in the care, custody, control, upbringing, protection, and management of their children and protects the family's decision-making process from arbitrary governmental coercion, manipulation, or restraint.

463. Parents do not assert a generalized constitutional right to notification of every school event, a freestanding right to school information, or a right to dictate ordinary curricular or administrative decisions. Their claim arises instead from Defendants' affirmative and deliberate manipulation of Parents' ability to make fundamental decisions concerning the immediate physical safety and welfare of their profoundly disabled, nonverbal child.

464. Defendants knew that J.P. could not reliably communicate the abuse to Parents and that Parents therefore depended upon District officials for truthful information concerning threats to his safety.

465. By at least November 18, 2024, District administrators possessed detailed allegations of abuse and corroborating information. Nevertheless, at the November 21, 2024 meeting, Parents were told nothing about those allegations and were affirmatively told that Kline's removal resulted from a "personality conflict." During this same period and before Parents removed J.P., Yanni personally reinforced that false narrative to James Pepper and assured him that there was nothing to be concerned about. After Parents removed J.P. on December 18, 2024, Defendants continued to conceal material facts and, on December 19, 2024, represented that the investigation had found "no evidence of abuse," despite the validated concerns alleged herein.

466. This conduct was not mere nondisclosure. Defendants affirmatively substituted false and materially misleading explanations for known abuse allegations and thereby manipulated Parents' decision-making process. Parents relied upon those assurances and, lacking the truth, did not immediately remove J.P. from Room 119 or take the protective actions they would have taken had the abuse allegations been truthfully disclosed. The misrepresentations separately prolonged Defendants' interference with Parents' ability to understand the nature and extent of what had happened to J.P., seek appropriate medical and therapeutic care, and pursue protective and legal remedies.

467. As a direct and foreseeable consequence of the pre-removal deception, J.P. remained exposed to the persons accused of abusing him until Parents ultimately removed him from the classroom on December 18, 2024, and Parents were deprived during that period of the ability to exercise their primary authority over his care, custody, protection, medical needs, safety, and welfare.

468. Defendants' conduct was deliberate, arbitrary, and conscience-shocking when viewed in context: the deception was repeated rather than momentary; Defendants possessed detailed and corroborated reports of abuse; J.P. was profoundly disabled and nonverbal; Defendants knew he could not tell Parents what was happening; the risk concerned immediate physical safety rather than an ordinary educational disagreement; and Defendants allegedly chose false reassurance while leaving the accused adults in control of him. There was no legitimate educational, safety, or governmental interest in knowingly deceiving Parents about allegations that their child was being abused.

469. The conduct alleged herein therefore violated James and Lisa Pepper's substantive-due-process right to familial integrity and freedom from affirmative governmental coercion,

manipulation, or restraint of fundamental parental decision-making. The right asserted is specifically the right to make decisions concerning a child's immediate care and physical safety free from deliberate state manipulation, not a generalized right to receive information from a public school.

470. Long before the events alleged here, Third Circuit precedent had recognized both the fundamental parental liberty interest and the distinction between mere failure to notify and governmental coercion, manipulation, or restraint of family decision-making. Plaintiffs therefore allege that reasonable school officials had fair warning that deliberately using false information to manipulate parents' decisions about a nonverbal child's immediate physical safety would intrude upon constitutionally protected familial decision-making.

471. CBSD is liable under *Monell* because the interference resulted from the policies, customs, practices, final-policymaker decisions, delegated authority, and/or ratification alleged above, including deliberate concealment of abuse allegations, suppression of reporting, false communications to Parents and authorities, and decisions by officials with final or delegated policymaking authority. Plaintiffs specifically allege that Yanni personally participated in the false reassurance and concealment while exercising the final or delegated operational authority described above. Municipal liability does not depend upon whether an individual defendant may ultimately establish qualified immunity.

472. As a direct and proximate result, James and Lisa Pepper suffered the loss of their ability to make timely and informed decisions concerning J.P.'s safety and care, severe emotional distress, destruction of trust in the public institutions charged with caring for their nonverbal child, economic and out-of-pocket losses caused by the delayed protective response, and other

compensable injuries personal to them. J.P.'s separate injuries are pleaded and sought under the counts asserting his own rights.

473. Plaintiffs seek compensatory damages, punitive damages against the individual Defendants where permitted, attorneys' fees and costs under 42 U.S.C. § 1988, and such other relief as the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs James Pepper and Lisa Pepper, individually and as parents and natural guardians of J.P., a minor, respectfully requests that this Court enter judgment in Plaintiff's favor and against all Defendants, and award the following relief:

a. Compensatory damages in an amount to be determined at trial;
b. Punitive damages in an amount to be determined at trial;
c. Attorney's fees and costs pursuant to 42 U.S.C. § 1988;
d. Pre-judgment and post-judgment interest;
e. Such other and further relief as this Court deems just and proper.
f. Plaintiff expressly does not seek double recovery for any single category of damages. To the extent damages are awarded under more than one count or theory of recovery for the same loss, any such award shall be credited against and reduce any overlapping award under any other count or theory, consistent with Pennsylvania law and applicable federal law, so as to prevent duplication of recovery.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

By: _/s/ M. Stewart Ryan, Esq._
M. Stewart Ryan, Esq.
sryan@laffeybucci.com
Brenda Harkavy, Esq.
bharkavy@laffeybucci.com
LAFFEY BUCCI D'ANDREA
REICH & RYAN
1100 Ludlow Street. Suite 300
Philadelphia, PA 19107
Telephone: 215-399-9255
Facsimile: 215-857-0075
*Attorneys for Plaintiffs*

Date: September 29, 2026